David W. HARDY, Steve W. Duncan, Joan Shepard, Causewell Vaughn, David Sims and Clinton Cox, Plaintiffs,

v.

NEW YORK NEWS INC., Defendant.

Hugh W. WYATT and Stanley Ace Adams, Plaintiffs,

v.

NEW YORK NEWS INC. and Tribune Co., Inc., Defendants.

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

NEW YORK NEWS INC., Defendant.

Nos. 82 Civ. 1147 (MGC), 82 Civ. 3662 (MGC) and 84 Civ. 6133 (MGC).

United States District Court, S.D. New York.

Jan. 28, 1987.

634

Brown & Brown by Susan S. Singer, Newark, N.J., Stolar, Alterman & Boop, P.C. by Daniel L. Alterman, Pia Gallegos, on brief, New York City, for plaintiffs David W. Hardy, Steve Duncan, Joan Shepard and Causewell Vaughn.

Patterson, Belknap, Webb & Tyler by Barbara A. McCormick, Ellen M. Martin and Thomas C. Morrison, on brief, New York City, for defendant Daily News, Inc.

Equal Employment Opportunity Com'n by Robert L. Williams, Ann Thacher Anderson and James L. Lee, on brief, New York City, amicus curiae.

KATHLEEN A. ROBERTS, United States Magistrate:

These three consolidated actions, now assigned to the Honorable Miriam Goldman Cedarbaum, were referred to me by Judge Walker on February 4, 1986, to decide a motion brought by the individual plaintiffs to compel the production of documents that the defendant claims are privileged.

The complaints in these actions charge violations of 42 U.S.C. § 1981 and of Title VII of the Civil Rights Act, alleging that the defendant New York News, Inc. ("News") has discriminated against non-white employees on the basis of race in promotion, compensation, and conditions and privileges of employment. The complaints also charge that the News has taken retaliatory actions against blacks who have filed grievances or charges with the Equal Employment Opportunity Commission ("EEOC").

The present motion concerns 50 documents [1] that were prepared between January 1976 and December 1982 and that relate to the employment of minorities at the News and to the charges now pending in federal court. The documents, which are identified and described in defendant's privileged document chart, have been withheld by the News on grounds of attorney-client, workproduct and self-critical analysis privilege.

At the time the matter was referred to me the parties had submitted affidavits and memoranda of law on the privilege issue, including plaintiffs' notice of motion, accompanying affidavits and memorandum of law filed on February 26, 1985; an affidavit by defendant's counsel Thomas C. Morrison, filed on April 24, 1985; and an affidavit of Susan Singer (counsel for the individual plaintiffs) filed on May 16, 1985.

At a pretrial conference held on February 18, 1986, I directed defendant to submit all withheld documents for *in camera* review, and to provide additional detailed information regarding the creation, use and dissemination of the documents in question.

By letter dated March 28, defendant submitted 1) a "privileged document chart;" 2) four supporting affidavits; 3) a complete set of withheld documents for *in camera* review; and 4) a "supporting document" to be reviewed *in camera*.

By letter dated April 11, 1986, and an accompanying affidavit, counsel for the individual plaintiffs raised a number of objections to defendant's submission. Further letters and additional documents were submitted by defendant on April 22 and May 28. The EEOC filed a memorandum of law on June 23, and on June 27, defendant submitted a letter response to the EEOC memorandum. Additional letters and documents (including *in camera* materials) were received from defendant on October 1 and 2, and from plaintiffs on October 1.

Following oral argument on October 3, defendant submitted a letter dated November 18, with additional affidavits and documents for *in camera* review; this letter was followed by further letters and accompanying affidavits from both parties dated December 4 and December 11.

### FACTS PERTAINING TO THE WITHHELD DOCUMENTS

The earliest documents in dispute (Documents 32 to 44) (the "Gallagher documents") were authored by Virginia Gallagher in 1976 when she was the Manager of Equal Employment Opportunity Programs for the News. Affidavit of Gregory L. Thornton, ("Thornton I") at ¶ 49 (annexed as Exhibit E to the April 24, 1985 affidavit of Thomas C. Morrison). According to the News, the withheld documents reflect Gallagher's efforts to monitor and analyze the success of the News in meeting minori-

---

**1.** Defendant originally withheld 52 documents, but subsequently withdrew its claims of privilege with respect to Documents 29 and 30.

ty employment goals she had set in a 1975 Affirmative Action Plan that was never formally implemented. *Id.* The Gallagher documents have been withheld solely on the basis of the self-critical analysis privilege.

The remaining documents were prepared by consultants to the News retained in late 1978 (the "Leopold/Carter documents") and by Janice Frazier, who joined the News in November 1979 as Gallagher's successor (the "Frazier documents"). The News has withheld these documents on multiple grounds, including attorney-client, work-product and self-critical analysis privilege.

The circumstances surrounding the preparation of the Leopold/Carter and Frazier documents are as follows:

In October 1976, Joseph F. Barletta joined the News as a Vice President with responsibility for both labor relations and personnel, which he described as including "compensation, benefits, EEOC, generally workers comp and safety * * *." Transcript of Barletta Deposition taken on December 19, 1984 ("Barletta Dep."), at 16.

On May 31, 1977, plaintiffs Joyce White and David Hardy sent a letter to the publisher of the News, complaining about a "general pattern of discrimination against nonwhite employees" at the News. Thornton I, Exhibit 1. The letter notes the recent formation of a "caucus" (subsequently known at the News as the Black Caucus) to seek "redress from management in a unified manner since the problem affects all nonwhite employees." *Id.* The caucus requested a meeting to discuss their grievances; but did not threaten litigation.[2]

Barletta was asked to work with the Black Caucus regarding the complaints raised in the May 31 letter. Affidavit of Susan Singer filed on May 16, 1985 ("Singer II"), Exhibit C.

In August 1977, Gregory L. Thornton was hired as Vice President and Director of Employee Relations, and was asked by Barletta to participate in discussions with the Black Caucus. Barletta Dep. at 25; Thornton I ¶ 1. Thornton is an attorney and states that he also served as in-house counsel. Thornton I ¶ 1.

Meetings between members of the Black Caucus and News management began in September 1977. The News was represented by Barletta, Thornton and Director of Personnel James Ambrosini. Supplemental Affidavit of Gregory Thornton ("Thornton III") submitted with defendant's November 18, 1986 letter to the court; Transcript of Ambrosini Deposition taken on September 20, 1984 ("Ambrosini Dep."), at 63–66. Gallagher, who was the target of criticism by the Black Caucus, played no role in these meetings. Ambrosini Dep. at 99.

Barletta testified that he "wanted to set up a dialogue" to "surface complaints before they became problems," and to find out "specifics about factual situations that were alleged." Barletta Dep. at 67. Barletta testified, however, that he viewed addressing the specific complaints of the Black Caucus as "short term solutions" and that "[l]ong term, I know I would want to get the company on an even keel in this whole equal employment area * * *." Barletta Dep. at 16–17, 78. Barletta also met privately with David Hardy to try to "satisfy some of the frustration that the people were exhibiting and at the same time help the company by getting into an area that would be one of the important areas of the personnel function * * *." Barletta Dep. at 75. Barletta felt that "we had to deal with the problem in a long term way, and that would involve trying to analytically approach the problem, trying to develop a workable affirmative action plan, and at some point * * * bring in a more profes-

---

2. In an earlier memorandum dated February 28, 1977, from plaintiff David Hardy to Mike O'Neill, Editor of the News, written to "straighten out" a problem regarding discrimination in assignments and promotion of nonwhite employees, Hardy states, "[i]f this effort fails, I will take immediate steps to file formal charges with the Equal Employment Opportunity Commission." Exhibit A, annexed to defendant's letter dated October 2, 1986. ("Defendant's October 2 Letter").

sional EEO manager." Barletta Dep. at 78.

Accordingly, the News embarked on a effort "to raise the consciousness of all the departments about the necessity [of putting blacks in management positions], and * * * tried to institute methodologies to do recruiting." Barletta Dep. at 86. See also Ambrosini Dep. at 71–76; 91–98.

Barletta described the Affirmative Action Plan that had been prepared by Gallagher as "a sort of cutting and pasting of legal requirements" that "wasn't really anything that anybody could work with. As a result, it had never been approved or never been implemented, and while I felt very strongly, the black caucus aside, that we should work toward that kind of a goal, I would have wanted it done in a much more professional way." Barletta Dep. at 96.

On May 10, 1978, members of the Black Caucus wrote to the publisher of the News proposing a minority hiring plan, and stating that if their plan were not promptly implemented, "[o]ur only alternative * * * will be to file a complaint with the Federal Government." Thornton I, Exhibit 2.

In late 1978, the News retained Leopold & Associates, a consulting firm in the field of equal employment opportunity headed by Marjorie Leopold. Affidavit of Marjorie Leopold ("Leopold Aff.") ¶ 1 (Exhibit C to the Affidavit of Thomas C. Morrison); Thornton III ¶ 2. During 1978 and 1979, Leopold and Marsha Carter, a consultant hired by Leopold, prepared analyses of the News' workforce and drafts of an Affirmative Action Plan (Documents 45, 46, 47 and 48).

According to Barletta, Leopold was hired to provide "general guidance" in the area of equal employment opportunity and "to examine the Virginia Gallagher situation and make a recommendation." Barletta Dep. at 97–98. The News, however, asserts in this motion that these documents were prepared in anticipation of litigation with the Black Caucus, and has withheld the documents on grounds of attorney-client and workproduct privilege, as well as self-critical analysis.

Thornton states that he concluded from the correspondence and discussions with the Black Caucus that their complaints would result in litigation. Thornton I ¶¶ 2–3; Defendant's October 2 Letter. Accordingly, he retained the law firm of Epstein Becker Borsody and Green ("Epstein Becker"), and "in conjunction with Epstein Becker, the services of Leopold." Id. at ¶ 4.

Thornton asserts that Leopold and Epstein Becker were retained "to help the News prepare for the specific litigation threatened by the Black Caucus and to determine how the News might avoid or defend against other possible litigation in relation to its minority employment practices." Thornton I ¶ 4. Although Leopold states that the materials prepared by her and by Carter were "intended for possible use in the litigation threatened by Hardy and the Black Caucus," Leopold Aff. ¶ 4, Carter described her work as "written materials in the field of equal employment opportunity." Affidavit of Marsha Carter ("Carter Aff.") ¶¶ 1, 2 (Exhibit E to the Morrison Affidavit). See also Ambrosini Dep. at 74–76 (Leopold was "an outside consultant retained by the News to assist with Equal Employment Opportunity matters"; no mention of preparation for litigation). None of the withheld documents prepared by Leopold or Carter mention the Black Caucus or even the threat of litigation generally.[3]

The News has submitted no contemporaneous memoranda reflecting Thornton's conclusions regarding the threat of litigation in 1977 or 1978 or describing the steps he advised the News to take regarding

---

**3.** In this connection I note that the "description" column of the Privileged Document Chart is somewhat misleading in that it describes a number of documents as materials "for use in litigation" that—on their face—make no reference to the Black Caucus or to litigation generally. In another instance, Thornton is listed under the "Addressee" column as "Counsel," even though the document itself is not addressed to him in that capacity.

potential litigation. Nor has the News submitted memoranda or other documents reflecting consultation between Thornton and in-house labor counsel Richard Jordan or with outside counsel. Ambrosini testified that he was never asked to confer with counsel during 1977–1979. Ambrosini Dep. at 109.

The News has also failed to produce any contemporaneous memoranda relating to the engagement of Leopold or Epstein Becker. In his latest affidavit, Thornton states that "[d]espite a diligent search of our files I was unable to locate a copy of the retainer agreement among the News, Leopold and Epstein." Thornton III ¶ 2.

Leopold recommended that Gallagher be replaced by a more professional EEO officer.[4] Barletta Dep. at 100, Carter Aff. ¶ 4; Leopold Aff. ¶ 5, and on November 5, 1979, Janice Frazier was hired as the News' Manager of Equal Employment Opportunity. The News concedes that Frazier was hired "primarily to perform the traditional function of an EEO Manager." With regard to that function, she reported to the Director of Personnel and "she was given substantial freedom to design and implement her role". Thornton I ¶ 7; Barletta Dep. at 107. However, "because of the threatened litigation from Hardy and the Black Caucus, it was also necessary for [Thornton] to assign Frazier to assist [him] in preparing for that litigation." Thornton I ¶ 7.

At the time Frazier was hired no charges had been filed. Between November 1979 and July 1980, each of the plaintiffs in this litigation filed charges of discrimination against the News with the EEOC. Thornton I ¶ 9. These charges were deferred to the New York City Commission on Human Rights ("NYCCHR") which served discovery requests on the News in December 1980. Id.

During this time Frazier continued the workforce analyses and drafting of an Af-firmative Action Plan begun by Leopold and Carter. The News claims that the documents reflecting this effort, like the Leopold/Carter documents, were prepared at the direction of attorneys for the purpose of obtaining legal advice, and in order to prepare for litigation with the plaintiffs and others. Accordingly, the News has withheld a number of documents pertaining to the development of an Affirmative Action Plan (Documents 6, 12, 20–23, 26–28), on grounds of attorney-client privilege and workproduct, as well as self-critical analysis.

The News has submitted no contemporaneous memoranda indicating that Frazier was assigned to prepare workforce analyses and an affirmative action plan as part of the News' preparation for litigation. In an affidavit filed in support of plaintiffs' motion to compel, Frazier states that she has no recollection of any reference to litigation or threatened litigation during her interviews prior to being hired or during her orientation period, and she did not understand that the purpose or potential use of the work force analysis and related memoranda pertained to any threatened litigation against the News. Affidavit of Janice Frazier ("Frazier I") ¶¶ 4, 11 (annexed to Notice of Motion). Ambrosini testified that Frazier's activities were not directed by counsel, Ambrosini Dep. at 110, and Frazier's statement is corroborated by her own contemporaneous memoranda of this process (some of which were directed to Thornton), which make no mention whatsoever of pending litigation. See Documents 6, 12, 20–23. Similarly, the affidavit submitted by Marsha Carter makes no mention of potential litigation. Carter states that in a meeting shortly after Frazier's appointment, Frazier was advised that she would be expected to "follow through to completion the process envisioned by the written materials prepared by Carter," and that "a regular requirement of that process

---

**4.** Gallagher continued to investigate some complaints of discrimination, but many of her other EEO responsibilities were decreased because of dissatisfaction with her performance. Gallagher provided some factual information to Leo-pold and to Carter, but she did not direct or supervise their work or participate with them in preparing written materials. Thornton 11/86 ¶ 3. Gallagher left the News in August 1979. Thornton 11/86 ¶ 3.

was the annual preparation of a work force analysis of all departments at the News and obtaining of updated information from various department heads at the News." Carter Aff. ¶ 5.

The News has also withheld Frazier's 1980 memoranda pertaining to the charges brought by plaintiffs (Documents 1–3), on the ground that they were prepared in anticipation of litigation. However, Frazier states that it was part of her general EEO function to evaluate employee discrimination complaints and to attempt to resolve complaints informally within the organization, and that memoranda prepared in connection with this function were not routinely forwarded to News' counsel or to the News' management. Frazier I ¶ 13.

In late 1980 the News retained the law firm of Seyfarth, Shaw, Fairweather & Geraldson ("Seyfarth, Shaw") to handle the charges filed by plaintiffs and to prepare for a potential lawsuit by the EEOC. Thornton III ¶ 10.

On January 15, 1981, Thornton formed a formal "conciliation/litigation team" consisting of himself, Richard Jordan (in-house Labor Counsel), the News' Personnel Director, an attorney from Seyfarth, Shaw, a member of the News' labor relations staff, and Frazier. Frazier was assigned to a subteam responsible for reviewing pending discrimination complaints and making "recommendations for action or litigation posture." Thornton I ¶ 10.

At the same time, the News was preparing for negotiations with the Newspaper Guild of New York ("Guild") concerning a new collective bargaining agreement. Separate and apart from the charges brought by plaintiffs, the Guild was pressing for the incorporation of an affirmative action plan in the new collective bargaining agreement. Affidavit of Robert Vann ("Vann Aff.") submitted with plaintiffs' December 4, 1986 letter to the court. The News concedes that it agreed to provide the Guild with "an Equal Employment Opportunity and Affirmative Action policy statement" by August 1, 1981. Thornton III ¶¶ 15, 16, and there are specific references in the withheld documents to the News' "commitment" to the Guild to implement an Affirmative Action Plan. See, e.g., Documents 5, 9, 10; see also Supporting Document at p. 3.

In October 1981, Seyfarth, Shaw hired Marsha Carter, (who had previously served as an EEO consultant with Leopold), as a consultant "to assist in certain matters relating to affirmative action and pending equal employment opportunity litigation at the News." Carter Aff. ¶ 7. Carter states that she relied on Janice Frazier to supply her with information, and that Frazier attended meetings with Seyfarth, Shaw. Frazier asserts that her meetings with Seyfarth, Shaw were unrelated to any specific employee grievances or charges and that she was at no time told that any part of her work was under the firm's direction. Frazier I ¶¶ 3, 12. However, there is substantial evidence that she participated in the efforts by News management and Seyfarth, Shaw to defend the News against the charges brought by plaintiffs and to prepare for possible additional litigation by other individuals or the EEOC. See, e.g., Supporting document submitted on March 28, 1986 for in camera review ("Supporting Document"); Thornton I ¶ 13a through g and documents submitted for in camera review with defendant's October 1, 1986 letter to the court. The News asserts that Documents 4, 5, 7–11, 15–19, 24, 25 and 31 were prepared by Frazier as part of her responsibilities as a member of the conciliation/litigation team. Affidavit of Gregory Thornton ("Thornton II") submitted with defendant's March 28, 1986 letter to the Court.

As might be expected, the News and its counsel determined that the Affirmative Action Plan targeted for implementation in early 1981 could play an important role in settling the pending charges, avoiding other charges, or ultimately in litigating the issues. See e.g., Supporting document; Documents 13, 24. In fact, the implementation of an affirmative action plan was discussed during conciliation efforts with the EEOC, See Thornton III, Exhibits F to

I (submitted for *in camera* review), and, when the News finally implemented a plan in 1984, a copy was shown to plaintiffs and to the EEOC during settlement negotiations. See also plaintiffs' April 11, 1986 letter to the court. The News asserts that Documents 49, 50 and 51 were prepared by Frazier at the direction of Carter and Seyfarth, Shaw as part of this strategy and are therefore protected as attorney client communications and/or workproduct. Affidavit of Richard J. Jordan, ¶ 5, submitted with defendant's November 18, 1986 letter to the Court.

## DISCUSSION

### I. *Self-Critical Analysis*

The News has withheld 37 documents [5] on grounds that they are protected from disclosure by the self-critical analysis or self-evaluative privilege. This privilege has been recognized in the context of hospital committee reports,[6] certain internal investigatory reports [7] and various equal employment opportunity forms submitted to the government,[8] and is based upon the concern that disclosure of documents reflecting candid self-examination will deter or suppress socially useful investigations and evaluations or compliance with the law or with professional standards. *See generally*, Note, *The Privilege of Self-Critical Analysis*, 96 Harv.L.Rev. 1083 (1983).

It is well established that " 'the public ... has a right to every man's evidence,'

except for those persons protected by a constitutional, common-law, or statutory privilege," *Branzburg v. Hayes*, 408 U.S. 665, 688, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626 (1972) (citations omitted), and such privileges "are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon*, 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974). Moreover, "[i]n resolving the tensions between the opposed needs of disclosure of confidentiality we are reminded that the discovery rules are to be accorded broad and liberal treatment, particularly where proof of intent is required." *Gray v. Board of Higher Educ., City of New York*, 692 F.2d 901, 904 (2d Cir.1982), *citing Herbert v. Lando*, 441 U.S. 153, 170–75, 99 S.Ct. 1635, 1645–48, 60 L.Ed.2d 115 (1979).

Accordingly, a number of courts have declined to recognize the privilege or held that its application should be severely restricted in employment discrimination cases in view of the strong policy favoring private enforcement of the anti-discrimination laws. *See, e.g., Witten v. A.H. Smith & Co.*, 100 F.R.D. 446, 451 (D.Md.1984); *Ligon v. Frito-Lay, Inc.*, 19 Fair Empl.Prac. Cas. 722, 722–23 (N.D.Tex.1978); *Webb v. Westinghouse Elec. Corp.*, 81 F.R.D. 431, 433–34 (E.D.Pa.1978). *See also, Zahorik v. Cornell Univ.*, 98 F.R.D. 27, 32 (N.D.N.Y. 1983) (disclosure ordered of all affirmative action plans).

---

**5.** Documents 6–13, 16, 20, 21, 23, 25, 26, 28, 49–52 (Frazier) 32–44 (Gallagher) 45–48 (Leopold/Carter).

**6.** *See, e.g., Gillman v. United States*, 53 F.R.D. 316 (S.N.N.Y.1971); *Bredice v. Doctors Hospital, Inc.*, 50 F.R.D. 249 (D.D.C.1970).

**7.** *Gray v. Bd. of Higher Educ. City of New York*, 92 F.R.D. 87 (S.D.N.Y.1981) (tenure committee votes subject to privilege); *rev'd*, 692 F.2d 901 (2d Cir.1982); *Lasky v. Am. Broadcasting Cos.*, Slip Op. 83 Civ. 7438, (S.D.N.Y. August 11, 1986) [Available on WESTLAW, DCTU database] (documents analyzing broadcast protected by privilege); *New York Stock Exchange v. Sloan*, 22 Fed.R.Serv. 500 (S.D.N.Y.1976) (documents regarding securities investigation); *Richards v. Maine Cent. R.R.*, 21 F.R.D. 590 (D.Me.1957)

(documents pertaining to railway accident investigations).

**8.** *Jamison v. Storer Broadcasting Co.*, 511 F.Supp. 1286 (E.D.Mich.1981); *O'Connor v. Chrysler Corp.*, 86 F.R.D. 211 (D.Mass.1980); *Roberts v. National Detroit Corp.*, 25 Fair Empl. Prac.Cas. 697 (E.D.Mich.1980); *McClain v. Mack Trucks, Inc.*, 85 F.R.D. 53 (E.D.Pa.1979); *Stevenson v. General Elec. Co.*, 18 Fair Empl.Prac.Cas. 746 (S.D.Ohio 1978); *Johnson v. Southern Ry. Co.*, 25 Fair Empl.Prac.Cas. 714 (N.D.Ga.1977); *Parker v. Kroger Co.*, 25 Fair Empl.Prac.Cas. 104 (N.D.Ga.1977); *Dickerson v. U.S. Steel Corp.*, 12 Empl.Prac.Dec. (CCS) ¶ 11,095 (E.D.Pa.1976); *Sanday v. Cornegie-Mellon Univ.*, 12 Fair Empl. Prac.Cas. 101 (W.D.Pa.1975); *Banks v. Lockheed-Georgia Co.*, 53 F.R.D. 283 (N.D.Ga.1971).

Those courts that have recognized the privilege have restricted its application to "purely evaluative" material and have ordered disclosure of non-evaluative facts, statistics or other data.[9] *See, e.g., Banks v. Lockheed-Georgia Co.,* 53 F.R.D. 283, 285 (N.D.Ga.1971) (defendant must provide plaintiffs with statistical or factual information).

Moreover, in the area of employment discrimination virtually every court has limited the privilege to information or reports that are mandated by statute or regulation. *Roberts v. Carrier Corp.,* 107 F.R.D. 678, 685 (N.D.Ind.1985); *Resnick v. American Dental Ass.,* 95 F.R.D. 372, 374–375 (N.D. Ill.1982); *O'Connor v. Chrysler Corp.,* 86 F.R.D. 211, 217 (D.Mass.1980); *cf. Webb v. Westinghouse Elec. Corp.,* 81 F.R.D. 431, 435 (E.D.Pa.1978) (disclosure of objective information will not chill candid self-evaluation, even though information was received in course of fulfilling equal employment obligations).[10] As the court observed in *O'Connor,* the self-critical analysis privilege rests on the "highly-valued interests * * * to assure fairness to persons who have been required by law to engage in self-evaluation * * * and to make the self-evaluation process more effective by creating an effective incentive structure for candid and unconstrained self-evaluation." *O'Connor,* 86 F.R.D. at 218. The *O'Connor* court perceived unfairness in a rule that would allow the government to require companies to engage in self-critical analysis and then hand that analysis over to plaintiff litigants as ammunition. However, as the court pointed out in *Resnick,* where self-evaluation has been voluntarily

undertaken, "[n]either that fairness rationale nor [an] effective enforcement rationale operates * * *. No unfairness exists, for no third party required [the defendant] to make a critical self-evaulation, or indeed, any evaluation at all." 95 F.R.D. at 375. It is undisputed that the News was not required by the government to prepare the withheld documents.

In addition, several courts have raised serious questions about the underlying assumption of the privilege, *i.e.,* that disclosure would significantly discourage self-critical activity, *Witten,* 100 F.R.D. at 452–53; *O'Connor,* 86 F.R.D. at 217 (both observing that deterrents to candid self-evaluation may exist wholly apart from the threat of disclosure in litigation). Those courts that have recognized a privilege for self-critical analysis have nonetheless held that the privilege is qualified and that its application is subject to a balancing of the general policy interests against the interests of the individual plaintiff. *Mazzella v. RCA Global Communications, Inc.* 642 F.Supp. 1531, 1534 (S.D.N.Y.1984); *Webb,* 81 F.R.D. at 434; *Roberts v. National Detroit Corp.,* 87 F.R.D. 30 (E.D.Mich.1980); *NOW v. Sperry Rand Corp.,* 88 F.R.D. 272 (D.Conn.1980); *O'Connor,* 86 F.R.D. at 217–18.

■ I find that the interest of the plaintiffs in gathering the information necessary to prove their case, particularly to prove the element of discriminatory intent, outweighs the interest in fostering candid self-analysis and voluntary compliance with equal employment laws, because the threat of disclosure would have an insignificant deterrent effect upon the preparation of

---

9. Indeed, defendant cites only two cases that that explicitly extended the privilege to voluntary prepared reports or analyses, *Mazzella v. RCA Global Communications, Inc.,* 642 F.Supp. 1531 (S.D.N.Y.1984); *Rosario v. New York Times Co.,* 84 F.R.D. 626, 631 (S.D.N.Y.1979) and four which appear to make no distinction between mandatory and voluntary reports or do not indicate whether the analysis were required by the government. *See,* cases cited in defendant's November 18, 1986 letter to the Court at p. 5.

10. Indeed, at deposition, Ambrosini testified without objection that statistical analysis had indicated underutilization of minorities at the News. Ambrosini Dep. at 76, 83–84, 94–96, 110–111. This testimony suggests that there was no expectation of confidentiality in these analyses. The lack of such an expectation undercuts the claim of privilege. *See, Witten v. A.H. Smith & Co.,* 100 F.R.D. 446, 452 (D.Md.1984); *O'Connor v. Chrysler Corp.,* 86 F.R.D. 211, 218 (D.Mass. 1980). In addition, the disclosure of the conclusions arguably constitutes a waiver of any privilege that might have been asserted.

the kind of documents that are being withheld in this case.

Most of the documents withheld on grounds of self-critical analysis contain or refer to analyses of minority utilization at the News and comparisons between the minority composition of the News workforce and various labor pools in the economy. It is questionable whether this information is "evaluative" at all since it is simply a recording of statistical information that has already been provided or that is readily available in the demographic literature.

The remaining documents pertain, for the most part, to the development of an affirmative action plan, the setting of minority hiring goals based upon an assessment of potential job openings, and reports or memoranda regarding whether the goals were met.

The News argues that the self-critical analysis privilege should be extended to documents pertaining to voluntary affirmative action in order to encourage voluntary efforts that would be deterred by the prospect of disclosure. Defendant's November 18, 1986 letters to the court. The News also argues that disclosure of the information in this case would penalize the News for having set overly ambitious minority hiring goals. Affidavit of Ellen Martin, ("Martin Aff.") submitted for *in camera* review with defendant's November 18, 1986, letter to the court.

I am not persuaded that the prospect of disclosure in litigation would seriously deter the voluntary development of affirmative action programs. Regardless of whether the News is required to set minority hiring goals, it has an obligation to comply with the law and, as a matter of sound business management, has an obligation to take steps to prevent litigation by implementing policies that will improve the utilization of minorities.

Accordingly, the failure of the News or any other corporation to initiate and continue agressive affirmative action programs merely because documents pertaining to their efforts might become available in the context of litigation would be contrary to basic principles of risk management. A number of the cases cited above demonstrate that companies like the News have in fact undertaken studies and initiated affirmative action programs for business purposes. *See, e.g., Resnick,* 95 F.R.D. at 375. The News itself implemented an Affirmative Action Plan in 1984 even though it could not, with any certainty, expect that effort to remain confidential. Such efforts will continue to be driven by labor negotiations and employee relations in a company with a large minority workforce. Self-evaluation in the context of individual grievances is also likely to continue despite the possibility of disclosure because it is essential to the resolution of complaints internally and without litigation, which is consistent with the business interests of management.

It also appears from the testimony of Barletta and Ambrosini that the News itself recognizes the importance of an open process of self-evaluation and recognizes that minority relations and the development of an affirmative action policy are an integral part of the modern personnel function and essential to the smooth operation of a business.[11]

Assuming that the disclosure of these documents would to some extent discourage aggressive affirmative action at the News, the general public interest in fostering such action is clearly outweighed by plaintiffs' need for the withheld documents which demonstrate that the News has been on notice of underutilization for a number of years, has repeatedly failed to implement an affirmative action plan despite promises to do so, and has failed to meet informal minority hiring goals. This information is clearly relevant on the issue of

---

**11.** Inconsistent decisions on discovery motions brought by the private plaintiffs and the EEOC would be particularly inappropriate in this case where the EEOC lawsuit was prompted by the plaintiffs' charges and the EEOC seeks damages for those individuals harmed by the defendant's employment practices.

643

discriminatory intent. *Sweeney v. Board of Trustees of Keene State College*, 569 F.2d 169, 179 (1st Cir.1978); *Witten*, 100 F.R.D. at 454, *Webb*, 81 F.R.D. at 435.

Finally, with respect to all of the documents withheld on grounds of self-critical analysis, it is my understanding that these documents have been requested not only by the private plaintiffs, but also by the EEOC. As the court observed in *Federal Trade Commission v. TRW, Inc.*, 628 F.2d 207, 210 (D.D.C.1980), "[w]hatever may be the status of the 'self-evaluative' privilege in the context of private litigation, courts with apparent uniformity have refused its application where * * * the documents in question have been sought by a governmental agency." (Citations omitted.) *See, United States v. Noall*, 587 F.2d 123 (2d Cir.1978), *cert. denied*, 441 U.S. 923, 99 S.Ct. 2031, 60 L.Ed.2d 396 (1979) (privilege not applied to documents sought by Internal Revenue Service); *See also, Witten*, 100 F.R.D. at 450; *O'Connor*, 86 F.R.D. at 213 (self-critical analysis privilege prohibits disclosure to *private* plaintiffs). Although the EEOC has not filed its own motion to compel, counsel advised the court that it intends to do so if the motion of the individual plaintiffs is denied. Because it is virtually certain that the News would not be successful in asserting the self-critical analysis privilege against the EEOC's request, the denial of the present motion to compel will not ultimately protect the documents from disclosure and *a fortiori* will not eliminate the alleged chilling effect of disclosure on the News' affirmative efforts.[12]

Accordingly, plaintiffs' motion to compel is granted in so far as it seeks documents withheld on grounds of self-critical analysis.

### Attorney-Client and Attorney Workproduct Privilege

The News also asserts that the Leopold/Carter and Frazier documents are protected from disclosure by the attorney-client and/or workproduct privileges.

■ The burden of establishing the attorney-client privilege rests upon the party claiming it. *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *Sneider v. Kimberly-Clark Corp.*, 91 F.R.D. 1, 3 (N.D.Ill.1980). The privilege attaches:

"(1) "where legal advice of any kind is sought

(2) from a professional legal advisor in his capacity as such,

(3) the communications relating to that purpose,

(4) made in confidence

(5) by the client,

(6) are at his instance permanently protected

(7) from disclosure by himself or by the legal advisor,

(8) except the protection be waived * *."

*United States v. Bein*, 728 F.2d 107, 112 (2d Cir.1984), *cert. denied, sub. nom. DeAngelis v. U.S.*, 469 U.S. 837, 105 S.Ct. 135, 83 L.Ed.2d 75 (1984), quoting *United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961); *accord, In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1036 (2d Cir.1984); *In re Horowitz*, 482 F.2d 72, 80–81 n. 7 (2d Cir.1973) *cert. denied*, 414, U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973), *reh. denied*, 414 U.S. 1052, 94 S.Ct. 556, 38 L.Ed.2d 340 (1973).

■ The attorney-client privilege is triggered only by a client's request for legal, as contrasted with business advice, and is "limited to communications made to attorneys solely for the purpose of the corporation seeking legal advice and its counsel rendering it." *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1037. When the ultimate corporate decision is based on both a business policy and a legal evalua-

---

12. By contrast, some documents pertaining to this litigation were clearly marked confidential, or, at the very least, captioned in a manner that clearly indicated their connection with pending litigation. *See e.g.*, Supporting Document; Thornton I ¶ 13a–g and documents submitted with defendant's October 1, 1986, letter to the court.

tion, the business aspects of the decision are not protected simply because legal considerations are also involved. *SCM v. Xerox,* 70 F.R.D. 508, 517 (D.Conn.1976).

■ Furthermore, the privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney. *Upjohn Co. v. United States,* 449 U.S. 383, 395, 101 S.Ct. 677, 685, 66 L.Ed.2d 584 (1981).

■ Finally, the party who wishes to claim the privilege must take appropriate action to preserve the confidentiality of the documents. *In re Horowitz,* 482 F.2d at 82; *see also, Teachers Ins., Etc. v. Shamrock Broadcasting Co.,* 521 F.Supp. 638, 645 (S.D.N.Y.1981).

■ The attorney workproduct privilege attaches to documents prepared in anticipation of litigation for trial by a party or his representative. *Hickman v. Taylor,* 329 U.S. 495, 511–12, 67 S.Ct. 385, 393–94, 91 L.Ed. 451 (1947); F.R.Civ.P. 26(b)(3). The workproduct privilege is not intended to protect from general discovery materials prepared in the ordinary course of business. *See, Resnick,* 95 F.R.D. at 375. Accordingly, in determining whether a document constitutes attorney workproduct within the meaning of Rule 26, the court must determine "the primary motivating purpose behind the creation of the document." *United States v. Gulf Oil Corp.,* 760 F.2d 292, 296 (Temp.Emer.Ct.App. 1985), citing *United States v. Davis,* 636 F.2d 1028, 1040 (5th Cir.1981) *cert. denied,* 454 U.S. 862, 102 S.Ct. 320, 70 L.Ed.2d 162 (1981). "If the primary motivating purpose behind the creation of the document is not to assist in pending or impending litigation, then a finding that the document enjoys work product immunity is not mandated." *Gulf,* at 296.

With these principles in mind, I turn to the withheld documents.

■ It is important to note at the outset that none of the withheld documents was authored by an attorney, and none is addressed to either Epstein Becker or Seyfarth, Shaw. Although some of the documents are addressed or were sent to Thornton, there is nothing to indicate that Thornton requested or received any of the documents at issue, or the information contained in them, in the capacity of a legal advisor and solely for the purpose of rendering legal advice to the corporation. Thornton is not address as "counsel" and does not identify himself as "counsel" in any of the documents. Cf. *Upjohn,* 101 S.Ct. at 681, 685. Accordingly, I find that the News has failed to establish that Thornton himself was acting as a legal advisor to the corporation as opposed to Director of Employee or Labor Relations.

I also find that the News failed to make appropriate affirmative efforts to identify these documents as privileged and to preserve their confidentiality.

■ Although the News claims that these documents were treated as confidential and kept in locked cabinets, none of these documents is marked "confidential" or "privileged." [13] The documents were not segregated, but were intermingled with all other personnel documents. Moreover, in a situation where the author or recipient of allegedly privileged documents functions as a corporate manager as well as an attorney, efforts must include clear designation of those communications sent or received in his capacity as a legal advisor.

The manner in which the News treated these documents also supports plaintiffs' contention that they were not confidential attorney-client communications but internal memoranda prepared and circulated as part of the News' ongoing business effort to develop a professional EEO function and an Affirmative Action Plan. See pp. 6–7. *supra.*

---

**13.** In fact, the *first* reference to the Affirmative Action Plan in the context of the pending litigation is in a memorandum entitled "Recommended Action Re Pending Discrimination Claims," prepared by Thornton on or about January 15, 1981. Supporting Document for In Camera Review submitted with defendant's March 28, 1986 letter to the Court.

*The Leopold/Carter Documents Prepared in 1978 and 1979*

These documents consist of workforce analyses, comparative labor pool statistics, analyses of potential job opportunities for minorities at the News, and draft Affirmative Action Plans.

Document 46 begins with a letter from Marsha Carter to Gregory Thornton, "Director of Labor Relations," enclosing "sections of the 1979 Affirmative Action Program for the News." Document 47 is headed: "Subject: Affirmative Action Plan Utilization Analysis, Lines of Progress, 'Anticipated Opportunities'." This document is addressed to five department heads and was apparently not even forwarded to Thornton.

Document 48 is an undated packet of handwritten statistical analyses "prepared by or for Leopold." There is no evidence that this document was ever sent to an attorney.

As noted earlier, there is no indication that the Leopold/Carter documents were prepared at the request of or were forwarded to the News' outside counsel at this time, Epstein Becker. Although some of the documents are letters or memoranda to Thornton, I find for the reasons stated above that he was not acting in the capacity of a legal advisor. Thornton is addressed by Leopold and Carter only as Director of Labor or Employee Relations.

Moreover, I find that the primary purpose of the work performed by Leopold and Carter was to develop an Affirmative Action Plan and only incidentally to prepare for the Black Caucus litigation. See *Resnick*, 95 F.R.D. at 375 (lawyer-client relationship "tangential" to affirmative action studies that were essentially management oriented. Significantly, there is no reference in any of these documents to the Black Caucus or to litigation generally, and, as noted earlier, no reference to litigation in the affidavit of Carter regarding the purpose of her assignment.

I further find that these documents do not in any way reveal litigation strategy or the mental impressions or thought processes of an attorney.

 Accordingly, I find that these documents are not protected by either the attorney-client privilege or the attorney workproduct privilege and direct that Documents 45, 46, 47 and 48 be produced in their entirety.

*The Frazier Documents*

 Most of the withheld documents consist of memoranda pertaining to the development and implementation of an Affirmative Action Plan, and drafts of Affirmative Action Plans for 1980, 1981 and 1982. None of these documents was prepared by an attorney. Indeed, none of these documents even mentions pending or threatened litigation. Nor is there any indication that these documents were prepared to assist either in-house counsel or outside counsel in rendering legal advice. Many were not even sent to Thornton. Indeed, they were addressed to over 15 different non-attorney managers. I therefore find that these documents are not attorney-client communication and that they do not reveal any confidential communications with counsel.

I further find that these documents were prepared not in contemplation of litigation, but as part of a general EEO function begun at The News by Gallagher in 1975, and continued under Barletta. *See* pp. 636–637, *supra*. The fact that Frazier was required to prepare *annual* updates of the Leopold/Frazier analyses demonstrates their essentially management purpose.

It is apparent from a review of the withheld documents that the News intended from the outset to implement an Affirmative Action Plan as part of its long range management policy. There are repeated references in the withheld materials to target dates for the implementation of the Affirmative Action Plans developed by Frazier, *see, e.g.,* Documents 12, 15, 28, and indications that the plan would be available for inspection by employees. *See, e.g.,* Documents 9, 25. As noted above, the News was at one point "committed" to

implementing an Affirmative Action Plan as part of its labor negotiations with the Guild.

■ It appears that sometime in 1981, The News and its attorneys discussed and perhaps decided to use the implementation of an Affirmative Action Plan as part of an effort to settle the pending cases.[14] *See* page 639, *supra.* However, the fact that documents prepared for a business purpose were also determined to be of potential use in pending litigation does not turn these documents into workproduct or confidential communications between client and attorney. *See, Barr Marine Products Co., Inc. v. Borg-Warner,* 84 F.R.D. 631, 635 (E.D. Pa.1979) ("business communications cannot be insulated from discovery by virtue of the mention of an attorney's name, or their being directed to an attorney").

Moreover, at the same time the News was contemplating the use of the Affirmative Action Plan in connection with the pending litigation, it was also continuing to work toward implementation of the Plan as part of its long range management and personnel effort in the area of equal employment opportunity, *see, e.g.,* Document 7, and was using the Affirmative Action Plan in its labor negotiations with the Guild. *See* page 639, supra. I therefore find that even after Seyfarth, Shaw was retained, Frazier's work on the Affirmative Action Plan was neither solely for the purpose of seeking legal advice nor primarily in preparation for litigation.

Finally, I note that none of these documents on its face contains any reference to litigation strategy or reveals the mental impressions or thought processes of an attorney.

Accordingly, the News is directed to produce Documents 6–12, 15–28, and 49–51.

■ I find, however, that those documents pertaining to Frazier's investigation of specific pending charges appear to have been prepared in anticipation of litigation and are protected trial preparation material.

Plaintiffs argue that a number of these documents are not privileged because Frazier was responsible for investigating grievances as part of her personnel function. While I agree that Frazier's position often included informal investigation and resolution of complaints by minorities, these documents were prepared at a time when the charges had moved definitively toward litigation and the News had engaged outside counsel. Under these circumstances, I find that these documents were prepared by Frazier in anticipation of litigation and not as part of her routine personnel function. In contrast to the other Frazier documents, these are captioned in a manner that clearly indicates their relevance to pending litigation. These documents contain Frazier's assessment of the merits of particular actions, as well as information that appears to have been requested by counsel, and in some instances specific references to litigation strategy.

Accordingly, plaintiffs' motion to compel is denied as to Documents 1–5, 13, 14, 31, and 52.

## CONCLUSION

For the reasons set forth above, plaintiffs' motion to compel is granted insofar as it seeks disclosure of documents claimed to be protected under the self-critical analysis privilege. Plaintiffs' motion to compel is granted with respect to the following documents claimed to be protected by attorney-client and/or workproduct privilege: Documents 6–12, 15–30, 45–51. Plaintiffs' motion is denied with respect to Documents 1–5, 13, 14, 31 and 52. Defendant is there-

---

**14.** In light of my findings regarding defendant's failure to establish the existence of an attorney/client relationship or to show that the documents reveal attorney workproduct, I do not reach plaintiffs' additional argument that disclosure of the 1983 Affirmative Action Plan to plaintiffs in settlement negotiations effected a waiver of the asserted privileges with respect to earlier compilations of workforce information or drafts of the News' Affirmative Action Plan. See plaintiffs' letters dated April 11 and October 2, 1986 and defendant's letter dated April 22, 1986.

fore directed to produce Documents 6–12, 15–30, and 32–51.

SO ORDERED.