Margaret A. TROUPIN, Plaintiff,

v.

METROPOLITAN LIFE INSURANCE COMPANY, Defendant.

No. 95 Civ. 7239 (RWS).

United States District Court, S.D. New York.

Dec. 4, 1996.

Jeffrey M. Bernbach, Jason L. Bernbach, New York City, for Plaintiff.

Rosenman & Colin, New York City (Robert E. Smith, of counsel) and Kasowitz, Benson, Torres & Friedman, New York City (Eric J. Wallach, of counsel), for Defendant.

## OPINION

SWEET, District Judge.

Plaintiff Margaret A. Troupin ("Troupin" or "Plaintiff") has moved pursuant to Rule 37, Fed.R.Civ.P., to compel disclosure of materials prepared by Defendant Metropolitan Life Insurance Company ("MetLife" or "Defendant") regarding the hiring and promotion of females and people over age 40 in Personal Insurance.

For the reasons set forth below, the motion will be granted in part.

### Parties

Plaintiff Troupin was formerly a training director in MetLife's Personal Insurance home office. She resigned from MetLife in October, 1992.

Defendant MetLife is a New York corporation.

### Prior Proceedings

In February, 1993, Troupin filed a charge with the New York State Division of Human Rights ("SDHR") alleging, *inter alia*, that MetLife discriminated against her on the basis of her age and sex. The SDHR conducted an investigation and held a fact-finding conference during which each side presented witnesses and documentary evidence. In August 1995, the Equal Opportunity Employment Commission ("EEOC") issued a

Notice of Right to Sue Letter. On August 22, 1995, the SDHR issued a finding of No Probable Cause and dismissed the complaint.

On or about November 6, 1995, the EEOC adopted the SDHR's finding and issued its own finding that "the evidence obtained during the investigation does not establish violations of Title VII or the ADEA."

In August 1995, Troupin filed the Complaint in this action, alleging that MetLife discriminated against her on the basis of her age and sex with respect to the two job assignment decisions about which she had filed her complaint with the SDHR. On or about October 23, 1996, MetLife answered the Complaint. On April 30, 1996, Troupin filed the instant motion to compel. Oral argument on the motion was heard on September 18, 1996, at which time the motion was considered fully submitted.

*Facts*

Troupin, formerly a training director in MetLife's Personnel Insurance home office, alleges that prior to her resignation from MetLife in October 1992, she was twice denied promotions based on her gender. Troupin also alleges that MetLife has engaged in a "pattern and practice" of discrimination.

On or about October 23, 1996 Troupin served upon MetLife Plaintiff's First Request for the Production of Documents ("Plaintiff's Request"). Plaintiff's Request No. 19 sought "[a]ll reports and documents concerning the findings, research and raw data collected by the Diversity Management Unit (under the direction of Ed McDonnell) or any other internal units or departments or outside vendors assigned to do research by the Diversity Management Unit regarding: a) hiring and promotion of females in Personal Insurance (field, territories, regions, and home office); and b) hiring and promotion of people over 40 in Personal Insurance."

Plaintiff's Request No. 20 seeks "[a]ll reports and documents covering findings, research and raw data concerning (a) hiring and promotion of females and (b) hiring and promotion of persons over age 40 at MetLife Corporation."

Plaintiff's Request No. 21 seeks "[a]ll documents concerning efforts by corporate Human Resources and the CMO (senior executive body of the corporation), to correct hiring imbalances based on sex and age for the period 1989 through 1992."

One of the two documents specifically at issue in this motion is a document dated March 15, 1993, from B. Crimmins to R.N. Maurer, F.B. Lynch, G.B. Trotta, A. Amodeo, H.B. Leff and B.C. Timpano, a memo, with attachments, regarding diversity planning in MetLife's Personal Insurance (the "Report"). The other category of documents at issue in this motion are the results of the Personal Insurance Employee Opinion Survey for thirteen diversity-related items, which was distributed in November 1992 to administrative territorial personnel nationwide and the Personal Insurance home office departments (the "Survey Results").

*Discussion*

I. **The Materials Sought Are Relevant**

■ Rule 26(b)(1), F.R.C.P. provides that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action ..." In this context, relevance is "defined broadly to include any materials which 'appear reasonably calculated to lead to the discovery of admissible evidence.'" *Bank Brussels Lambert v. Chase Manhattan Bank*, 1995 WL 617362 at *1 (S.D.N.Y.) (citing *Daval Steel Products v. M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir.1991); *Martin v. Valley National Bank of Arizona*, 140 F.R.D. 291, 300 (S.D.N.Y.1991)). To be discoverable, the material need not be admissible at trial. *Bank Brussels Lambert*, 1995 WL 617362 at *1.

■ The Report and the Survey Results, which study internal shortcomings regarding advancement opportunities available to female employees, are relevant to Troupin's claim that she was denied promotion on the basis of her sex; the Report and the Survey Results will likely shed light on MetLife's intent in denying Troupin a promotion.

II. **The Self–Critical Analysis Privilege**

■ MetLife claims that the Report and the Survey Results are protected from disclo-

sure under the self-critical analysis privilege (the "Privilege"), which shields certain institutional self-analyses from discovery. The rationale for the Privilege is that in its absence, institutions such as MetLife would be deterred from engaging in any critical self-analysis.

### A. *The Privilege is Recognized in This Circuit*

■ Before determining whether the Report and the Survey Results are protected by the privilege, the Court must determine whether such a privilege exists under applicable law. Troupin's Complaint includes federal claims brought pursuant to 42 U.S.C. § 1983 and state claims brought pursuant to the New York State Human Rights Law. Where, as here, an action alleges both federal and state claims, the asserted privileges are governed by principles of federal law. *See von Bulow by Auersperg v. von Bulow,* 811 F.2d 136, 141 (2d Cir.1987); *see also PPM America, Inc. v. Marriott Corp.,* 152 F.R.D. 32, 34 (S.D.N.Y.1993).[1]

In this Circuit, the privilege has been recognized by some courts, but the scope of its coverage has been somewhat limited. Courts have recognized the Privilege where " 'an intrusion into the self-evaluative analyses of an institution would have an adverse effect on the [evaluative] process, with a net detriment to a cognizable public interest.' " *Flynn v. Goldman, Sachs & Co.,* 1993 WL 362380 at *1 (S.D.N.Y. Sept. 16, 1993) (quoting *Cobb v. Rockefeller University,* 58 Fair Empl.Prac.Cas. (BNA) 184, 1991 WL 222125 at *1 (S.D.N.Y. Oct. 24, 1991)).

This Court has set forth the following standard for applying the privilege:

> where a party establishes that disclosure of requested information could cause injury to it or otherwise thwart desirable social policies, the discovering party will be required to demonstrate its need for the information, and the harm it would suffer from the denial of such information would

outweigh the injury that disclosure would cause the other party or the interests cited by it.

*Flynn,* 1993 WL 362380 at *1.

The leading cases in this District that have held documents to be protected from disclosure by the Privilege are *Mazzella v. RCA Global Communications, Inc.,* 1984 WL 55541 (S.D.N.Y. March 28, 1984) and *Flynn v. Goldman, Sachs & Co.,* 1993 WL 362380 (S.D.N.Y. Sept. 16, 1993). In *Mazzella,* the Court held that, in order to encourage internal self-analysis and compliance with Title VII while still providing the relevant data to plaintiffs claiming discrimination, factual matter must be produced but evaluative analysis would be protected from disclosure. *Mazzella,* 1984 WL 55541.

Applying the standard set forth above, the *Flynn* Court followed the reasoning of *Mazzella* and held that certain confidential reports and employee interviews relating to employment barriers to women, which were prepared for the defendant and kept confidential, were protected by the Privilege.

In *Hardy v. New York News Inc.,* 114 F.R.D. 633 (S.D.N.Y.1987), however, this Court rejected the defendant's claim of the Privilege, and held that an employer's analysis of minority utilization, as well as comparisons between minority compositions of the workforce and various labor pools in the economy, were subject to discovery in an employment discrimination action. The Court found that plaintiff's interest in gathering the information necessary to prove their case outweighed any interest in fostering self-analysis. *Id.* at 6440 (quoting *Gray v. Board of Higher Education, City of New York,* 692 F.2d 901, 904 (2d Cir.1982) and citing *Herbert v. Lando,* 441 U.S. 153, 170–75, 99 S.Ct. 1635, 1645–1648, 60 L.Ed.2d 115 (1979)). Specifically, *Hardy* held that because of the centrality of intent to employment discrimination cases, the discrimination plaintiff's need to prove the employer's intent

---

1. This principle is consistent with the legislative history of Federal Rules of Evidence 501, which provides, *inter alia,* that "[i]t is also intended that the Federal law of privileges should be applied with respect to pendant [sic] State law claims

when they arise in a Federal question case." S.Rep. No. 1277, 93rd Cong., 2d Session, *reprinted in* 1974 U.S.Code Cong. & Ad.News 7051, 7059 n. 16.

outweighed the defendant's need for confidentiality. *Id.* at 642–43.

Moreover, the *Hardy* Court held, "in the area of employment discrimination virtually every court [that has recognized the Privilege] has limited the privilege to information or reports that are mandated by statute or regulation." *Hardy,* 114 F.R.D. at 641 (collecting cases). This is so because courts recognizing the Privilege "perceived an unfairness in a rule that would allow the government to require companies to engage in self-critical analysis and then hand that analysis over to plaintiff litigants as ammunition." *Id.* at 641. "[W]here self evaluation has been voluntarily undertaken, '[n]either that fairness rationale nor [an] effective enforcement rationale operates.... No unfairness exists, for no third party required [the defendant] to make critical self-evaluation, or indeed, any evaluation at all.'" *Id.* (quoting *Resnick v. American Dental Ass'n,* 95 F.R.D. 372, 375 (N.D.Ill.1982)). *But see Flynn,* 1993 WL 362380 at *1 (holding self-critical privilege applies to materials created voluntarily).

Finally, the Privilege's rationale has been called into question by the Supreme Court and by commentators' analysis. The Privilege is intended to "serve[s] the public interest by encouraging self-improvement through uninhibited self-analysis and evaluation." *In re Crazy Eddie Securities Litigation,* 792 F.Supp. 197, 205 (E.D.N.Y.1992). In *University of Pennsylvania v. EEOC,* 493 U.S. 182, 188–89, 110 S.Ct. 577, 581–582, 107 L.Ed.2d 571 (1990), the Supreme Court cast some doubt on the vitality of the Privilege by declining to recognize a qualified common-law privilege against the disclosure of confidential peer review materials, a privilege based largely on the same policy considerations as the self-critical analysis privilege. *See Chemical Bank v. Affiliated FM Insurance,* 1994 WL 89292 (S.D.N.Y.).

Moreover, one commentator has noted that:

> [b]ecause a corporation functions in a competitive commercial environment, it must constantly evaluate its organization and personnel in order to survive. Failure to critically review its performance inevitably leads to imperceptions about the market, and within a short time, penalties from the market place. This pressure to conduct critical appraisals is not only imposed by the milieu in which the corporation operates, but also emanates from within the organization which creates incentives for employers to review its operations.

James F. Flanagan, *Rejecting a General Privilege for Self–Critical Analyses,* 51 Geo. Was.L.Rev. 551, 561 (1983).

### B. *The Privileged Will Be Recognized Here*

While recognizing the questionable force of the reasoning behind the Privilege, the Court will follow the reasoning set forth in *Flynn* and recognize the Privilege. Applying the *Flynn* test, set forth above, to the instant case, MetLife has made the threshold showing that disclosure of the requested information could cause the injury to MetLife or otherwise thwart desirable social policies. *See Flynn,* 1993 WL 362380 at *1. The Report was the result of a special project undertaken by the Diversity Management Unit to define the status of MetLife's Personal Insurance line of business, and in particular, in advancing the interests of women and minorities in personal insurance, with a view towards developing plans for the further advancement of such interests. The Report was prepared with the intention and understanding that it would be kept strictly confidential, and circulation of the Report has been restricted to senior officials or those with a "need to know" the contents of the Report. MetLife contends that disclosure of the report would have a chilling effect on MetLife's continued willingness to evaluate and examine its progress in satisfying the objectives of Title VII, and that disclosure would effectively penalize MetLife for acting to advance the interests of women and minority employees, and would render self-evaluation prohibitively costly.

Notwithstanding the generality of MetLife's showing of injury, to the extent disclosure would create a disincentive for MetLife and other companies to evaluate their compliance with anti-discrimination, disclosure would cause injury and thwart the desirable social policy of eliminating discrimination in

employment. *See Flynn*, 1993 WL 362380 at *1; *cf. Cobb*, 1991 WL 222125 at *2 (affidavit specifying harm was "skeletal and conclusory, asserting only that disclosure could interfere with the achievement of [affirmative action] goals").

The question is thus presented whether Troupin has demonstrated a need for the information, and that the harm she would suffer from being denied such information would outweigh MetLife's injury or the injury to social policies. Troupin contends that, given the centrality of MetLife's intent to this discrimination action, she would suffer great harm if production of the Report were not compelled. The *Hardy* Court relied on this premise as the basis for its holding in an employment discrimination case that the plaintiff's interest in obtaining self-critical materials outweighed the general interest in fostering candid self-analysis and voluntary compliance with anti-discrimination laws. *See Hardy*, 114 F.R.D. at 641.

Relying on the reasoning set forth in *Hardy*, the Court finds that Troupin has demonstrated that her specific need for the Report and the Survey Results outweighs the generalized harm that might result from their disclosure. However, MetLife will be compelled to disclose only those portions of the Report and the Survey Results containing factual information to which Troupin is entitled pursuant to the normal discovery process. MetLife will not be compelled to produce any other portions of the materials sought, including narrative, evaluative or analytical portions. *See Mazzella*, 1984 WL 55541. Accordingly, the Court seeks to eliminate any disincentive for MetLife and other organizations to continue to conduct self-critical evaluations like those at issue here. *See Flynn*, 1993 WL 362380 at *1.

Because it remains unclear exactly which portions of the Survey Results and the Report are discoverable, MetLife will produce those documents forthwith to the Court for an *in camera* inspection. The Court will then determine which portions of those documents constitute discoverable facts, and which constitute narrative, evaluative or analytical materials protected by the Privilege.

*Conclusion*

For the reasons set forth above, Troupin's motion to compel disclosure is hereby granted in part.

It is so ordered.