**In re ASHANTI GOLDFIELDS SECURITIES LITIGATION.**

**No. 00 CV 717(DGT)(RML).**

United States District Court, E.D. New York.

Jan. 7, 2003.

Paul D. Young, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, New York City, for Plaintiffs.

Douglas W. Henkin, Milbank, Tweed, Hadley & McCloy, New York City, for Defendants.

## ORDER

LEVY, United States Magistrate Judge.

Plaintiff shareholders in this case allege that defendant Ashanti Goldfields Company Limited ("Ashanti"), a corporation organized under the laws of the Republic of Ghana, and certain of its officers (collectively, "defendants") violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b–5 promulgated thereunder, by misrepresenting the nature of hedging transactions in which Ashanti engaged. One of plaintiffs' principal claims is that defendants failed to make proper disclosure concerning Ashanti's "hedge" book, which is comprised of assorted financial instruments primarily dealing with future sales of gold at set prices. *See In re Ashanti Goldfields Secs. Litig.*, 184 F.Supp.2d 247, 249 (E.D.N.Y.2002). Specifically, plaintiffs allege that defendants falsely stated that:

> the "hedge" book was designed to insulate and did insulate Ashanti from volatility in the price of gold, whereas in fact the "hedge" book materially increased Ashanti's exposure to gold price volatility such that the "hedge" book was in fact a "reckless" bet on future movements in the price of gold, which bet was of such enormity that it would subject Ashanti to margin calls that would greatly exceed its available cash. Undisclosed to investors, through the purported "hedge" book, Ashanti had converted itself from a gold mining company into a financial entity that was speculating recklessly on future gold price volatility.

(Consolidated Amended Class Action Complaint, dated Oct. 27, 2000 ("Amended Compl."), ¶ 12.) The class period is July 28, 1999 through October 5, 1999. (*Id.* ¶ 1.)

At issue here is defendants' claim that documents AG032714–AG032809, AG031518A, and AG032878–AG032884, which plaintiffs seek through discovery, are protected by the "self-evaluative privilege." AG032714–AG032809 is Ashanti's Gold Hedg-

ing Policy Blueprint, dated May 4, 2000 (the "Policy Blueprint"), which has been submitted for *in camera* inspection. AG031518A is apparently the same document, attached as an exhibit to Ashanti's February 10, 2001 response to the SEC's December 6, 2000 comment letter. AG032878–AG032884 is an SEC comment letter, which also discusses Ashanti's Gold Hedging Policy Blueprint.[1]

The question whether a self-evaluative privilege should be recognized as a matter of federal law has not yet been settled by the Supreme Court or the Second Circuit, and a number of lower federal courts have declined to recognize it. *See, e.g., Roberts v. Hunt,* 187 F.R.D. 71, 75 (W.D.N.Y.1999) (rejecting the self-evaluative privilege as unavailable under federal law); *Franzon v. Massena Memorial Hosp.,* 189 F.R.D. 220, 224 (N.D.N.Y. 1999) (refusing to recognize the privilege); *Wimer v. Sealand Serv., Inc.,* No. 96 CIV. 8730, 1997 WL 375661 at *1 (S.D.N.Y. July 3, 1997) (observing that "this particular privilege has led a checkered existence in the federal courts"). However, that question need not be decided here, for even courts that have recognized a self-evaluative privilege have held that " 'the scope of its coverage has been somewhat limited.' " *In re Federation Internationale de Basketball,* 117 F.Supp.2d 403, 407 (S.D.N.Y.2000) (quoting *Troupin v. Metropolitan Life Ins. Co.,* 169 F.R.D. 546, 548 (S.D.N.Y.1996)). Courts that recognize the privilege do so in order to protect a party's confidential analysis of its own performance when that analysis tries to correct problems, on the assumption that disclosure of the analysis during litigation may deter future candid reviews. *In re Nieri,* No. Civ. A. M12–329, 2000 WL 60214, at *2 (S.D.N.Y. Jan.24, 2000). The contention is that a self-evaluative privilege serves the public interest by encouraging self-improvement through uninhibited self-analysis and evaluation. *In re Crazy Eddie Secs. Litig.,* 792 F.Supp. 197, 205 (E.D.N.Y.1992). *See also Wimer,* 1997 WL 375661, at *1 ("if a party has conducted a confidential analysis of its own performance in a matter implicating a substantial public interest, with a view towards correction of errors, the disclosure of that analysis in the context of litigation may deter the party from conducting such a candid review in the future"); *Flynn v. Goldman, Sachs & Co.,* No. 91 Civ. 0035, 1993 WL 362380, at *1 (S.D.N.Y. Sept. 16, 1993) (the privilege has been recognized where " 'an intrusion into the self-evaluative analyses of an institution would have an adverse effect on the [evaluative] process, with a net detriment to a cognizable public interest' ") (quoting *Cobb v. Rockefeller Univ.,* No. 90 Civ. 6516, 1991 WL 222125, at *1 (S.D.N.Y. Oct.24, 1991)); *Lasky v. American Broadcasting Cos., Inc.,* 5 Fed. R. Serv.3d 1366, 1986 WL 9223, at *2 (S.D.N.Y.1986) (recognizing self-evaluative privilege in libel case).

 Because privileges are disfavored in the law, they must be strictly construed. *University of Pennsylvania v. EEOC,* 493 U.S. 182, 189, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990) (rejecting a peer review privilege as necessary to effective academic tenure decisions). The burden of establishing the privilege rests with the party asserting it (*see Kaufman v. City of New York,* No. 98 CIV. 2648, 1999 WL 239698, at *4 (S.D.N.Y. Apr.22, 1999)), which must make a "detailed and convincing showing" of the harm to be anticipated from the disclosure. *In re Nieri,* 2000 WL 60214, at *3. Once that showing is made, the court will consider other factors relevant to application of the self-evaluative privilege, including (1) the extent to which the material in question is factual as distinguished from evaluative, (2) the requesting party's need for the information, and (3) any adverse effect on the accomplishment of desirable social ends. *In re Federation Internationale de Basketball,* 117 F.Supp.2d at 407. *See also Sheppard v. Consolidated Edison Co. of N.Y., Inc.,* 893 F.Supp. 6, 7 (E.D.N.Y.1995). In addition, the material must have been prepared "with the expectation it would remain confidential and must have, in fact, been kept confidential." *Spencer v. Sea–Land Service, Inc.,* No. 98 CIV

---

1. It is unclear whether defendants are asserting a privilege with respect to this document, but they have presented no authority for the proposition that a document authored by the SEC could be protected by defendants' claim of privilege. Regardless, the court would reject any assertion of the self-evaluative privilege with respect to this document, for the reasons discussed *infra.*

2817, 1999 WL 619637, at *2 (S.D.N.Y. Aug. 16, 1999) (citing *Dowling*, 971 F.2d at 426; *In re Salomon Inc. Sec. Litig.*, Nos. 91 Civ. 5442, 91 Civ. 5471, 1992 WL 350762, at *1 (S.D.N.Y. Nov.13, 1992)).[2]

▮ I have reviewed the submitted documents closely and I find that defendants have failed to justify the application of the self-evaluative privilege to the documents at issue. First, even accepting as true defendants' assertion that the Policy Blueprint is the product of a voluntary, self-critical analysis by a corporation which, in good faith, was seeking to improve its hedging policies, this court is not convinced that disclosure of the document would impede future self-critical analysis and evaluation of Ashanti's hedge book or other business-related policies. A company in the business of mining and selling gold has significant incentives to assess and correct problems in its business strategies and undertake corrective measures to avoid future losses. Those incentives far outweigh any harm that might result from disclosure. In other words, defendants have not satisfied their burden of demonstrating that the information contained in the Policy Blueprint is of the type whose flow would be curtailed if discovery were allowed.[3] *See, e.g., Cruz v. Coach Stores, Inc.*, 196 F.R.D. 228, 232–33 (S.D.N.Y.2000) (notes of interviews conducted by investigative firm to determine if employees were engaging in finan-

cial improprieties, racial discrimination or sexual harassment were not protected by the self-critical analysis privilege; "A company has an obvious economic interest in engaging in self-evaluations of employee misconduct.... The public interest would hardly be served by cloaking the fruits of those inquiries with privilege simply on the ground of encouraging [the company] to make an inquiry that it necessarily would have made in any case"); *Abbott v. Harris Publications*, No. 97 Civ. 7648, 1999 WL 549002, at *2 (S.D.N.Y. July 28, 1999) ("Reviews such as these [concerning the defendant's internal investigation of the processing of plaintiff's application to serve as a dog show judge] are conducted by organizations because they are concerned with the integrity of their own operations and, while they no doubt would prefer that the information not be made public, the fact that the results might be discoverable in civil litigation will not deter them from doing what their business interest requires"); *Pkfinans Int'l Corp. v. IBJ Schroder Leasing Corp.*, Nos. 93 Civ. 5375, 96 Civ. 1816, 1996 WL 675772, at *3 (S.D.N.Y. Nov.21, 1996) (rejecting claim that defendant's audit documents were protected by the self-evaluative privilege on grounds that the defendant "will likely continue to perform its audits ... out of an obvious business necessity...."); *Chemical Bank v. Affiliated FM Ins. Co.*, Nos. 87 CIV. 0150, 87 CIV.

---

**2.** Because I find that the documents are not protected by the self-evaluative privilege, it is unnecessary to address plaintiffs' argument that defendants waived the privilege by disclosing the Policy Blueprint to the SEC.

**3.** Defendants do not maintain that disclosure of the Blueprint would deter Ashanti from conducting self-critical analyses in the future. Rather, they cite *Flynn v. Goldman, Sachs & Co.*, 91 Civ. 0035, 1993 WL 362380 (S.D.N.Y. Sept.16, 1993), for the apparent proposition that the relevant question is whether the disclosure would deter *other companies* from engaging in self-evaluation. (*See* Letter from Douglas W. Henkin, Esq. to the court, dated Dec. 13, 2002, at 2 n. 1.) I do not read *Flynn* so broadly. *Flynn* was a sex-discrimination case in which the plaintiff sought disclosure of notes from confidential employee interviews that were conducted by a not-for-profit organization, named Catalyst, which was working with the defendant company to study barriers to the equal and fair employment of women. *Flynn*, 1993 WL 362380, at *1. Catalyst had

represented to the interviewed employees that the interviews would be strictly confidential and anonymous, and it sought a protective order on the ground that disclosing the documents would harm it and would reduce the likelihood that employers would seek such analyses from it or similar organizations. The court was persuaded that disclosure of the reports would make employers highly reluctant to retain organizations like Catalyst, thus impeding the goal of "eliminating barriers to the full participation of women in the highest levels of corporate America." *Id.* at *2. No such concerns are present here.

Moreover, even if defendants were asserting that disclosure of the documents would inhibit the free flow of future discussions, "this type of argument must be viewed with some skepticism," (*Byrnes v. Empire Blue Cross Blue Shield*, No. 98 Civ. 8520, 2000 WL 60221, at *4 (S.D.N.Y. Jan.25, 2000)), especially in the absence of any compelling reason to suggest that the type of self-evaluation in question is likely to be discouraged by disclosure of the documents at issue.

0151, 87 CIV. 0153, 87 CIV. 0835, 87 CIV. 1537, 87 CIV. 1538, 87 CIV.1954, 87 CIV. 1956, 87 CIV.1957, 1994 WL 89292, at *1 (S.D.N.Y. Mar.16, 1994) (denying protective order for documents relating to internal corporate investigation because the company had many incentives to conduct the investigation and the documents did not contain the type of information whose "flow would be curtailed if discovery were allowed"); *In re Salomon Inc. Secs. Litig.*, 91 Civ. 5442(RPP), 1992 WL 350762, at *4 (S.D.N.Y. Nov. 13, 1992) (rejecting application of self-critical analysis privilege to management control studies and internal audit reports, noting that the "economic efficiencies, the accuracy of financial reporting and the improvement of business standards achieved by [such programs and studies] are so integral to the success of a business that the free flow of information is not likely to be stemmed by the possibility of future disclosure").[4]

Moreover, defendants have not identified any desirable or important social policies that would be implicated or thwarted by disclosure, as in cases where the self-evaluative documents concern anti-discrimination measures or medical care. *See, e.g., Troupin,* 169 F.R.D. at 549 (recognizing self-evaluative privilege for confidential report prepared by insurance company's Diversity Management Unit for purpose of developing plans for advancing the interests of women and minority employees); *Sheppard,* 893 F.Supp. at 7–8 (granting protective order in employment discrimination case for study of affirmative action and employee opinions prepared for company because "disclosure would chill future voluntary self-critical analysis of compa-nies who in good faith seek to improve their employment practices and comply with Title VII"); *Flynn v. Goldman, Sachs & Co.,* No. 91 Civ. 0035, 1993 WL 362380, at *2 (S.D.N.Y. Sept. 16, 1993) (notes of interviews with defendant's employees, made with the understanding that any comments would be kept confidential and anonymous, held protected by the self-evaluative privilege in discrimination case because disclosure "would have a chilling effect on the future willingness of employees at defendant and other firms to speak candidly about sensitive topics"); *Mazzella v. RCA Global Communications, Inc.,* No. 83 Civ. 3716, 1984 WL 55541, at *4 (S.D.N.Y. Mar.28, 1984) (protecting evaluative material from disclosure in order to encourage internal self-analysis and compliance with Title VII); *Bredice v. Doctors Hosp., Inc.,* 50 F.R.D. 249, 250–51 (D.D.C. 1970) (recognizing conditional privilege for hospital's evaluation of the performance of medical procedures and techniques by its staff), *aff'd,* 479 F.2d 920 (D.C.Cir.1973). *See also Lasky,* 1986 WL 9223, at *1 ("The basic purpose underlying the privilege, to encourage self-improvement through unchilled self-analysis and evaluation, has particular force in the libel context where there is a societal need for the responsible exercise of First Amendment rights"). There is a strong public policy that favors the flow of self-critical analysis of things such as violations of constitutional and civil rights or life-and-death medical decisions, and that strong public policy simply does not apply here.[5]

Finally, Ashanti's interest in protecting its self-critical analyses must be balanced against the societal interest in discovery "as

---

**4.** Although the court in *In re Crazy Eddie Secs. Litig.,* 792 F.Supp. 197 (E.D.N.Y.1992), upheld a Magistrate Judge's order applying the self-evaluative privilege to an internal review of a corporate audit in a securities fraud case, the court did express skepticism toward the accounting firm's claim that production of the materials would "chill its attempt to monitor the quality of its work." *Id.* at 205. Importantly, the information underlying the review was available for the parties' experts to consider. *Id.* The court also noted that the self-evaluative privilege is not absolute, and that the need for disclosure must be balanced against the need for confidentiality—a matter particularly within the discretion of the district court. *See id.* Regardless, to the extent the instant opinion is contrary to *In re Crazy Eddie Secs. Litig.,* the court respectfully declines to follow that case. *See In re Salomon Inc. Secs. Litig.,* 1992 WL 350762, at *4 (declining to follow *In re Crazy Eddie Secs. Litig*).

**5.** Defendants cite two cases to support their argument that the Policy Blueprint is "the type of document to which the privilege has been applied," (Henkin Ltr. at 2), both of which are distinguishable. In the first, *UBS Asset Mgmt. (New York) Inc. v. Wood Gundy Corp.,* No. 95 Civ. 5157, 1999 WL 294843, 1999 U.S. Dist. LEXIS 6786 (S.D.N.Y. May 11, 1999), the court issued a protective order for documents from the defendant company's audit division, holding that the documents represented after-the-fact evaluation, "which by its nature incorporates legal advice and lawyers' work product...." *Id.* at *1, 1999 U.S. Dist. LEXIS 6786 at *3. As there is no claim

it contributes to the full and fair adjudication of the issues invoked in litigation." *Lasky*, 1986 WL 9223, at *2 (citing *Gray v. Board of Higher Educ. of the City of N.Y.*, 692 F.2d 901 (2d Cir.1982)). Fed.R.Civ.P. 26(b) mandates broad discovery of any non-privileged information that is "reasonably calculated" to lead to admissible evidence. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978) (relevance under Rule 26(b)(1) must be construed broadly "to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case"); *Morse/Diesel, Inc. v. Fidelity and Deposit Co. of Md.*, 122 F.R.D. 447, 449 (S.D.N.Y.1988) ("reasonably calculated" means " '*any possibility* that the information sought may be relevant to the subject matter of the action' ") (quoting *Mallinckrodt Chemical Works v. Goldman, Sachs & Co.*, 58 F.R.D. 348, 353 (S.D.N.Y. 1973)) (emphasis in original). *See also Zanowic v. Reno*, No. 97 Civ. 5292, 2000 WL 1376251, at *2 (S.D.N.Y. Sept.25, 2000) ("There can be no dispute that, although not unlimited, relevance, for the purposes of discovery, is an extremely broad concept"). In light of this expansive rule, defendants' contention that the documents are irrelevant is unavailing. That the Policy Blueprint con-

cerns the revised hedge policy, which postdates the class period, and plaintiffs have had access to other documents concerning Ashanti's hedge book as it existed during and before the class period, does not prove irrelevance. (*See* Henkin Ltr. at 2–3.) The Policy Blueprint does refer to the prior hedge book and to events that took place during the class period, and this court is not prepared to hold that it is not reasonably calculated to lead to the discovery of admissible evidence. *See Grigsby & Assocs., Inc. v. Rice Derivative Holdings, L.P.*, No. 00 Civ. 5056, 2002 WL 31599000, at *1 (S.D.N.Y. Nov.19, 2002) (granting motion to compel discovery where court was "unable to state that as a matter of law this discovery may not have some bearing on the relevant issues").

### CONCLUSION

For all of these reasons, defendants are directed to produce documents AG032714–AG032809, AG031518A, and AG032878–AG032884. Of course, this court does not pass on the admissibility of the documents, as that issue must be raised at trial.

SO ORDERED.

that the Policy Blueprint incorporates legal advice or attorney work product, this case is inapposite.

In the second, *In re Health Mgmt.*, CV–96–0889, 1999 WL 33594132, 1999 U.S. Dist. LEXIS 22729 (E.D.N.Y. Sept. 25, 1999), the district court, reviewing a Magistrate Judge's order under the deferential "clearly erroneous or contrary to law" standard, upheld the denial of a motion to compel documents prepared by the American Institute of Certified Public Accountants Quality Control Inquiry Committee as part of its investigation of an audit of the defendant company's financial statements. Although the court found the documents protected under the self-evaluative privilege, it is important to note that the audit at issue was not voluntary, but was mandatory for all accounting firms auditing SEC registrants pursuant to regulations designed to ensure that accounting firms generally adhere to quality control standards. *Id.* at *1, 1999 U.S. Dist. LEXIS 22729 at *4. The self-evaluative privilege "is not a broad privilege for any organization engaging in an evaluation of its policies or practices." *In re Application of the New York Times Co.*, No. M8–85, 1984 WL 971, at *4 (S.D.N.Y. Oct.9, 1984). Rather, "[t]o the extent

that courts have recognized this privilege at all, it has been invoked only in limited categories of cases" where the self-critical analysis was undertaken for the purpose of complying with the law or where there is an "overwhelming public interest" in protecting internal analyses. *Id.* at *3–4. *See also Abbott v. Harris Publications*, No. 97 Civ. 7648, 1999 WL 549002, at *1 (S.D.N.Y. July 28, 1999) (the rationale for the self-evaluative privilege is found in the " 'concern that disclosure of documents reflecting candid self-examination will deter or suppress socially useful investigations and evaluations or compliance with the law or with professional standards' ") (quoting *Hardy v. New York News Inc.*, 114 F.R.D. 633, 640 (S.D.N.Y.1987)). Here, there is no claim that the Policy Blueprint was created in an effort to ensure compliance with the law or that it implicates any public interest; it is simply a document that reflects an assessment of the corporation's gold hedging activities. In other words, it is a business document designed to evaluate ways the company can enhance profits and avoid losses, and it therefore falls outside the categories of materials to which courts generally have been willing to extend the qualified self-evaluative privilege.