Stephen MITCHELL, Plaintiffs,

v.

Harvey FISHBEIN, Chair of the Department Screening of the Supreme Court Panel of the Assigned Counsel Plan for New York County, in his personal and official capacity, Gerald Lebovits, Andrea Hirsch, Norman Reimer, Marvin Ray Rankin, Emily Olshansky, Isabel Alicia, George Golfinopoulos, the City of New York, and other unknown persons, Defendants.

No. 01 Civ. 2760(JGK)(GWG).

United States District Court, S.D. New York.

March 31, 2005.

Stephen Mitchell, New York City, pro se.

Constantine Speres, Monica Connell, Atty. General's Office, New York City, for defendants.

## OPINION AND ORDER

GORENSTEIN, United States Magistrate Judge.

Stephen Mitchell was formerly certified to serve on New York County's "18–B Panel"— the group of private attorneys who are paid by the County to provide legal services to indigent criminal defendants. When Mitchell applied for recertification to the 18–B Panel, however, his application was denied. Mitchell asserts in this lawsuit that his application was denied because of his race and in retaliation for his complaints of racial discrimination. Mitchell now moves to compel the production of documents relating to the recertification process. Specifically, he wants to learn the names of the judges and attorneys who provided comments about him during the recertification inquiry. He also wants to examine documents relating to other attorneys who sought recertification. The defendants have cross-moved for a protective order pursuant to Fed.R.Civ.P. 26(c). As is explained more fully below, each motion is granted in part and denied in part.

## I. BACKGROUND

### A. The Assigned Counsel Plan

New York County Law Article 18–B requires each county or municipality to have "a plan for providing counsel to persons charged with a crime [for which a sentence of imprisonment is authorized] ... who are financially unable to obtain counsel." N.Y. County Law § 722. The Assigned Counsel Plan in New York County is administered under rules issued by the justices of the Appellate Division, First Department. *See* N.Y. Comp.Codes R. & Regs. tit. 22, § 612.0; *see also* Bylaws of the Central Screening Committee Indigent Defendants Assigned Counsel Plan (reproduced as Ex. F to Notice

of Motion, filed December 1, 2004 (Docket # 81) ("Def. Notice of Motion")), at 1 (discussing the "obligation" of the First Department "to provide indigent criminal defendants with competent counsel"). The rules govern "the selection, designation, performance and professional conduct" of attorneys appointed to serve on the Panel. N.Y. Comp.Codes R. & Regs. tit. 22, § 612.0.

The First Department has created a Departmental Central Screening Committee (the "Committee" or "Screening Committee"). *Id.* § 612.3. The Committee reviews all applications of attorneys seeking appointment to the Panel in order to determine "whether an applicant is qualified for membership on ... the panel[ ]." *Id.* § 612.6. An attorney is appointed to the Panel "for an indefinite term subject to recertification as directed by the justices of the Appellate Division, First Department." *Id.* § 612.2.

### B. Complaint and Procedural History

Mitchell is an African–American attorney licensed in the State of New York. *See* Second Amended Complaint and Jury Demand, filed February 2, 2002 (Docket # 24) ("Am. Compl."), at 1. Mitchell alleges he was a member of the Panel from approximately 1995 to 1998, *see id.* ¶ 1, although he had previously served on the Kings County Panel, *id.* ¶ 5. Mitchell applied for recertification to New York County's Panel sometime between 1996 and 1998. *See id.* ¶ 16. In attachments to his application for recertification and in interviews with Committee members, Mitchell complained that the Assigned Counsel Plan's administration was infected with racism. *See id.* ¶¶ 18–21. In April 1998, Mitchell was notified that his application for recertification to the Panel was denied. *See id.* ¶ 2. The letter denying Mitchell's application for recertification stated that, "following a thorough and careful review of [his] recertification application," the Committee decided "to terminate [his] appointment to the Assigned Counsel Plan felony and misdemeanor panels." Letter from Norman L. Reimer to Stephen Mitchell, Esq., dated March 18, 1998 (reproduced as Ex. B to Exhibits in Support of Memo-

randum of Law in Response to Defendants' Motion for Protective Orders, undated).

Mitchell commenced the present action in March 2001 against several current and former members of the Screening Committee pursuant to 42 U.S.C. §§ 1981 and 1983 as well as State and local anti-discrimination laws. In his complaint, Mitchell alleges that the defendants terminated his appointment to the Panel on the basis of his race and in retaliation for his comments charging them with racial discrimination in their administration of the Assigned Counsel Plan. *See* Am. Compl. ¶¶ 22–25. In an Opinion and Order dated August 12, 2002, the district court dismissed all claims against the defendants on jurisdictional and immunity grounds. *See Mitchell v. Fishbein*, 216 F.Supp.2d 283, 287–290 (S.D.N.Y.2002). Mitchell appealed. On August 3, 2004, the Second Circuit reinstated these claims and remanded the case to the district court. *See Mitchell v. Fishbein*, 377 F.3d 157, 174–75 (2d Cir.2004).[1]

### C. *The Documents at Issue and the Instant Motions*

Following remand, Mitchell served the defendants with a request for documents that included a request to obtain documents pertaining to his own membership on the Panel and subsequent decertification. *See* Plaintiff's First Request for the Production of Documents, dated September 3, 2004 (reproduced as Ex. A to Def. Notice of Motion) ("Pl.Request"), at 4–5 & ¶¶ 1–4. The defendants have gathered documents responsive to this request, which will be referred to as the "Mitchell Certification Documents," and supplied them to the Court for *in camera* review. The defendants seek to withhold as privileged certain portions of these documents: specifically, those portions identifying judges and attorneys who made comments about Mitchell to the Committee. *See* Mem-

orandum of Law in Support of State Defendants' Motion for a Protective Order, filed December 1, 2004 (Docket # 82) ("Def.Mem."), at 6–7; Memorandum of Law in Further Support of State Defendants' Motion for a Protective Order and in Opposition to Plaintiff's Motion to Compel, filed January 21, 2005 (Docket # 93) ("Def. Reply Mem."), at 3; State Defendants' Privilege Log (reproduced as Ex. E to Def. Notice of Motion) ("Privilege Log"). The remaining portions of the Mitchell Certification Documents are being withheld because defendants have asked the Court to issue a protective order before they are released. *See* Def. Mem. at 7, 17.

In addition, Mitchell requested a variety of documents relating to the recertification of other attorneys to the Panel ("Other–Attorney Certification Documents"). *See* Pl. Request at 4–5 & ¶¶ 5–6, 9–10. For the most part, the documents responsive to this request have not been supplied to the Court for *in camera* review.[2] As described below, the defendants have raised a number of objections to producing these documents.

Each category of documents is described in further detail below.

### 1. *Mitchell Certification Documents*

The Mitchell Certification Documents were either created by or used in the review process undertaken by the Committee in connection with Mitchell's application for recertification to the Panel. *See generally* Affirmation of the Hon. Gerald Lebovits, dated November 24, 2004 (annexed to Def. Notice of Motion) ("Lebovits Aff."), ¶ 14. As described by Judge Gerald Lebovits (a former member of the Committee) and Harvey Fishbein, Esq. (the current Chair of the Committee), "members of the Screening Committee review, investigate, and make recommendations regarding the applications

---

1. Mitchell also sued the City of New York and two of its employees to obtain compensation past due for work he performed as a Panel attorney. *See* Am. Compl. ¶¶ 100–04. These claims ultimately settled. *See* Stipulation and Order of Settlement and Discontinuance as Against Defendants Isabel Alicea, George Golfinopoulos and City of New York, filed April 21, 2003 (Docket # 67).

2. The one exception is the document numbered by defendants as DEF 3. This document is a letter from defendant Norman Reimer, the former Chair of the Committee, to defendant Emily Olshansky, the former Administrator of the Assigned Counsel Plan. The letter makes reference to Mitchell as well as several other Panel applicants who were then in the process of being reviewed by the Committee.

of attorneys for certification or re-certification" to the Panel and "investigate any complaints lodged against 18–B panel attorneys." Lebovits Aff. ¶ 5; *accord* Affirmation of Harvey Fishbein, Esq., dated November 30, 2004 (annexed to Def. Notice of Motion) ("Fishbein Aff."), ¶ 5. Generally, an application for certification or recertification is assigned to a member of the Screening Committee, who will review the application, speak with the applicant, and contact judges and attorneys familiar with the applicant's work as a defense attorney. Lebovits Aff. ¶ 7; *accord* Fishbein Aff. ¶ 6. The purpose of this process is to obtain information pertaining to the applicant's work so that the Committee can determine the applicant's fitness to serve on the Panel. *See* Lebovits Aff. ¶¶ 7–8; Fishbein Aff. ¶ 6.

As part of the Committee's review of Mitchell's application, Judge Lebovits contacted attorneys and judges regarding Mitchell. Lebovits Aff. ¶ 11. Portions of the Mitchell Certification Documents include comments provided by judges and attorneys regarding Mitchell's conduct and performance as a defense attorney. *See id.* ¶¶ 14–15. Notably, the defendants are willing to produce virtually the entire text of these documents to Mitchell under a protective order. *See* Def. Mem. at 6–7. They seek to redact only the identities—that is, the names and other identifying information—of the judges and attorneys who provided comments to the Committee. *See id.* at 7.

The defendants argue that the self-critical analysis and/or deliberative process privileges protect this information from disclosure. *See id.* at 9–17; Privilege Log. The defendants also argue generally that this information may be withheld on the ground that it is confidential. Def. Reply. Mem. at 2–6, 9; Privilege Log. Mitchell opposes any redaction of the documents. *See* Response Memorandum of Law to Defendants' Motion for Protective Orders, filed January 14, 2005

(Docket # 92) ("Pl.Resp.Mem."), at 2–3, 15, 17–19; Reply to Defendants' Response to Plaintiff's Motion to Compel, filed January 31, 2005 (Docket # 95) ("Pl.Reply"), at 2–3, 5.

### 2. *Other–Attorney Certification Documents*

Mitchell also seeks documents pertaining to other attorneys who applied for recertification to the Panel during certain stated time periods. *See* Pl. Request at 4–5 & ¶¶ 5–6, 9–10. Mitchell contends that this information is relevant because, *inter alia,* he wishes to use statistics regarding recertifications in support of his claim. *See* Memorandum of Law in Support of Plaintiff's Motion to Compel (annexed to Notice of Motion, filed December 2, 2004 (Docket # 83)) ("Pl.Mem."), at 8–10; Pl. Resp. Mem. at 3. He asserts that discovery of this information would allow him to determine whether "persons with lesser qualifications were re-certified" to the Panel and whether there were any patterns of racial discrimination. Pl. Mem. at 10.

The defendants object to producing these documents on the grounds that the information sought by Mitchell is confidential, privileged and irrelevant. Def. Mem. at 8. The defendants contend further that production of the documents requested by Mitchell "would be unduly burdensome." *Id.*[3]

### II. *ANALYSIS*

#### A. *Mitchell Certification Documents*

The defendants have sought to prevent disclosure of the identity of judges and attorneys who are mentioned in the Mitchell Certification Documents on the ground that this information is confidential. *See* Privilege Log; Def. Reply Mem. at 2–6, 9. They have also sought to withhold this information on the grounds that it is protected by both the "self-critical analysis" and the deliberative process privileges. *See* Privilege Log; Def.

---

**3.** Mitchell has also sought to compel the defendants to respond to his requests for admission and seeks to have them "respond fully" to his interrogatories. *See* Pl. Mem. at 1, 17. The defendants, however, have timely submitted their response to the requests for admission. Thus, this portion of Mitchell's motion is denied. With respect to Mitchell's request that the Court re-

quire defendants to "respond fully" to his interrogatories, the Court denies this request because Mitchell has failed to comply with Local Civ. R. 37.1, which requires that he quote verbatim the interrogatories and the allegedly objectionable responses and that he set forth the grounds upon which he was entitled to prevail "as to each interrogatory."

Mem. at 9–17. It is unnecessary to reach the issue of the applicability of these privileges, however, because, after reviewing the documents *in camera*, the Court concludes that the information the defendants seek to withhold may properly be kept confidential pursuant to Fed.R.Civ.P. 26(c).

■■■ "[U]nder Rule 26(c), the appropriateness of protective relief from discovery depends upon a balancing of the litigation needs of the discovering party and any countervailing protectible interests of the party from whom discovery is sought." *Apex Oil Co. v. DiMauro*, 110 F.R.D. 490, 496 (S.D.N.Y.1985) (citing cases). Fed.R.Civ.P. 26(b)(2) specifically provides that a court may limit disclosure if, *inter alia:*

> the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

The term "burden" in Rule 26(b)(2) may be construed to limit disclosure "where the burden is not measured in the time or expense required to respond to requested discovery, but lies instead in the adverse consequences of the disclosure of sensitive, albeit unprivileged, material." *Johnson v. Nyack Hosp.*, 169 F.R.D. 550, 561–62 (S.D.N.Y.1996) (citations omitted). *Apex Oil* sets forth the following framework for analyzing claims for protective relief under Rule 26(c):

> [W]here a party establishes that disclosure of requested information could cause injury to it or otherwise thwart desirable social policies, the discovering party will be required to demonstrate that its need for the information, and the harm that it would suffer from the denial of such information, outweigh the injury that disclosure would cause either the other party or the interests cited by it.

110 F.R.D. at 496 (citing cases). A court's duty to balance these competing interests arises from its broad authority to limit or prevent discovery even in instances where the materials sought are relevant and within the scope of Rule 26(b). *See Johnson*, 169 F.R.D. at 562 ("[D]istrict courts have ... 'broad powers ... to regulate or prevent discovery even though the materials sought are within the scope of [Rule] 26(b), and these powers have always been freely exercised.'") (quoting Fed.R.Civ.P. 26(b) advisory committee's note) (some alterations in original).

■■■ Here, the defendants have provided affidavits from a former member and the current Chair of the Screening Committee to support their claim of confidentiality. In his affirmation, Judge Lebovits states that attorneys and judges evaluating an applicant's performance

> would offer honest appraisals only upon the understanding that their comments were part of the confidential screening process. This was certainly true in Mr. Mitchell's case. Many of the attorneys and judges I spoke to related grave concerns regarding Mr. Mitchell's competence and ethics. However, they clearly would not have divulged this important information if they believed that it would be made public.... To turn [the screening] process into one in which judges and attorneys are asked to publicly comment on the work of colleagues so that all members of the bar and the bench can learn of such comments would not be something in which many attorneys and judges would be willing to participate.

Lebovits Aff. ¶ 18. Judge Lebovits avers that he "personally assured the people with whom [he] spoke that their comments would remain confidential." *Id.* ¶ 12. Despite his assurances of confidentiality, however, there were specific instances in which judges and attorneys were unwilling to provide Lebovits with an evaluation of Mitchell. *See id.* Specifically, Judge Lebovits states that, "[i]n at least two instances during his review of ... Mitchell's file, this assurance of confidentiality was not enough to persuade people to speak." *Id.* Judge Lebovits also states that two State Supreme Court justices requested that their names and comments be kept even from other members of the Committee. *Id.* Another evaluator asked that Judge Lebovits not reveal his identity or the information he provided to anyone outside the subcommit-

tee. *Id.* Judge Lebovits notes that all comments made to him by judges and attorneys concerning Mitchell have, in fact, been kept confidential. *See* Lebovits Aff. ¶ 17; *see also* Fishbein Aff. ¶ 8 ("[T]he comments received about an applicant from judges, opponents and colleagues ... are kept confidential.... The Screening Committee has not and does not release the confidential comments of the third parties from whom it seeks evaluations.").

Mitchell contends that, because judges have a variety of methods by which they may criticize or sanction an attorney, such as filing a complaint with the state grievance committee, there is no need for the Committee's process to remain confidential. *See* Pl. Resp. Mem. at 9–10. This argument is a *non sequitur.* The Screening Committee has an independent obligation to review applications of attorneys seeking appointment or reappointment to the Panel in order to determine "whether [the] applicant is qualified for membership on ... the panel[ ]." *See* N.Y. Comp.Codes R. & Regs. tit. 22, § 612.6. The existence of other mechanisms by which a judge may make complaints about an attorney's conduct does not alter the Committee's obligation or reduce the Committee's need for confidentiality.

With respect to the harm that would result if documents identifying the judges and attorneys who provided comments to the Committee were disclosed, Judge Lebovits states:

> The screening process cannot function effectively without candid evaluation by judges, colleagues and adversaries. It requires complete confidentiality. The continued appointment to the panel of attorneys who are not sufficiently competent or whose conduct or ethics are questionable can have grave results for the criminal defendants whom they represent and can also have negative consequences regarding the credibility and public regard of other members of the 18–B panels.... Judges and attorneys must be free to give honest feedback regarding the performance of panel attorneys without fear of publicly embarrassing such attorneys or of recriminations from the attorney being screened.

*See* Lebovits Aff. ¶ 19. In his affirmation, Fishbein echoes many of the harms discussed by Judge Lebovits concerning the effect that disclosure of the information sought by Mitchell would have on the ability of the Committee to function. *See, e.g.,* Fishbein Aff. ¶ 11 ("Without evaluation of an applicant's advocacy for an accused, the Screening Committee cannot effectively gauge whether the applicant can provide adequate counsel, thus creating a risk that indigent persons charged with a crime will receive inadequate counsel, in violation of his or her constitutional rights.").

These affidavits provide a strong and uncontroverted showing of harm if the identities of judges and lawyers were to be disclosed. Moreover, common sense alone tells us that confidentiality is essential to the functioning of the screening process and that dissemination of the identities of judges and attorneys who have evaluated candidates would have a chilling effect on the willingness of such individuals to candidly evaluate future applicants to the Panel. *See United States v. Nixon,* 418 U.S. 683, 705, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process.") (footnote omitted). The defendants have also shown that, if the Committee were unable to obtain candid evaluations of Panel applicants, the ability of the Committee to perform its obligation of assessing which applicants were qualified to serve on the Panel would be greatly undermined. *See* Lebovits Aff. ¶ 19; Fishbein Aff. ¶ 11. Finally, the Committee advances an important societal interest by ensuring effective representation of indigent criminal defendants in satisfaction of its constitutionally mandated responsibilities. *See Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

The information in question, therefore, is entitled to protection absent a sufficiently strong showing of need by Mitchell. *See Apex Oil,* 110 F.R.D. at 496; *see also Flynn v. Goldman, Sachs & Co.,* 1993 WL 362380, at *2 (S.D.N.Y. Sept.16, 1993) (confidential communications that were "critically impor-

tant to eliciting candid responses" from defendant's employees would "not be disclosed absent a showing by plaintiff of compelling need for [the information]"). In support of his request for the information being sought, Mitchell asserts that, if he is not provided the identity of the evaluators, he will be unable to demonstrate that the defendants' stated reasons for denying his application for recertification to the Panel were pretextual. Pl. Resp. Mem. at 17. Mitchell contends that "[t]he discovery of the full content of the letters, including the identity of the evaluators, is required" so that he may have "the opportunity to demonstrate that the proffered reasons for the adverse decision were false or that there were other unlawfully discriminatory reasons for the decision." *Id.* at 18 (citation omitted). According to Mitchell, he would be unable to demonstrate pretext without information identifying his evaluators "because he would not know the context from which any criticisms" of his performance as an attorney "emerged." *Id.* at 17. Mitchell further asserts that he "is entitled to the names of the people who criticized his work and he is entitled to cross examine these people during a deposition or trial in order to test the veracity and reliability of any reports generated by the screening committee." *Id.* at 19; *accord id.* at 17; Pl. Reply at 2–3, 5. Mitchell argues that "[i]t is fundamentally unfair for a judge to be able to criticize an attorney's work ... while denying the attorney the opportunity to fully and fairly address the [judge's] concerns." Pl. Resp. Mem. at 10.

These arguments are insufficient to require disclosure of the information at issue. This would be a very different case if the defendants refused to disclose the actual comments made by judges and attorneys who evaluated Mitchell's fitness to serve on the Panel. In such an instance, Mitchell would have no way of discerning whether race or his complaints about racial discrimination played a part in the Committee's decision to deny his application for recertification to the Panel. Here, however, the defendants are willing to disclose the comments relied upon by the Committee in reaching its decision concerning Mitchell's application for recertifi-

cation to the Panel. It is the substance of these comments—not the identity of the persons who delivered them—that will provide the most compelling evidence as to whether Mitchell's decertification from the Panel was based on an impermissible motive.

Mitchell has expressed a strong desire to depose the judges and attorneys who provided comments to the Committee. Pl. Resp. Mem. at 17, 19; Pl. Reply at 2–3, 5. Mitchell also seeks to obtain "information about the specific facts and circumstances the evaluators considered" in commenting on his fitness to serve on the Panel. *See* Pl. Resp. Mem. at 15. But what went on in the minds of the judges and attorneys who evaluated Mitchell is of only speculative relevance to Mitchell's claims of discrimination and retaliation. Determining whether the Committee had an improper motive in denying Mitchell's application for recertification to the Panel requires an examination of what went on in the minds of the Committee members—not the persons who supplied them with information. Mitchell implies that the evaluators themselves could have been motivated by racism and, as a result, provided the Committee with negative comments concerning his fitness to serve on the Panel. *See id.* (arguing that obtaining the identity of the evaluators would assist the plaintiff in demonstrating, *inter alia*, the evaluators' retaliatory animus towards him). This sort of generalized speculation, however, is insufficient to outweigh the specific harms that the defendants have demonstrated would arise if the identities of the evaluators were to be disclosed.

Nor would the defendants' concerns about disclosing this confidential information be alleviated through the use of a protective order that allowed only Mitchell access to this information. The defendants' primary concern with disclosing the evaluators' identities is not with disclosure to the world at large but rather disclosure to Mitchell himself. Thus, providing this information to Mitchell alone is not an alternative. Indeed, any disclosure of the identities of the evaluators to Mitchell would undermine the Committee's ability to function since Mitchell's purpose in obtaining this information is to

allow him to notice the evaluators' depositions. *See* Pl. Resp. Mem. at 2, 19; Pl. Reply at 1–3, 5, 8; *cf. Mazzella v. RCA Global Communications, Inc.,* 1984 WL 55541, at *5 (S.D.N.Y. Mar.28, 1984) ("[T]he use of a protective order is unlikely to be an adequate answer to the danger that candid self-evaluations would be deterred if documents reflecting that process were subject to routine discovery; the protective order would not prevent use of the ... evaluation ... in litigation, and it is presumably that threat that is at the core of the problem."). The only protective order that would alleviate the defendants' concerns, therefore, would be one that ensured that Mitchell himself was unable to learn the evaluators' identities.

Accordingly, the Court grants the defendants' request to withhold the identities of the judges and attorneys who supplied comments to the Committee both with respect to the Mitchell Certification Documents and the Other–Attorney Certification Documents.

## B. *Other–Attorney Certification Documents*

Mitchell also seeks documents pertaining to other attorneys who were recertified or denied recertification to the Panel between 1993 and 2000 or 2002. *See* Pl. Request at 4–5 & ¶¶ 5–6, 9–10. These documents may be grouped into two categories: (1) "[t]he list of all attorneys" who were "declined membership on the homicide panel" or "were not re-certified for membership on the ... Panel ... between calendar years 1993 and 2002" ("List of Attorneys"), *id.* at 5 & ¶¶ 9–10; and (2) all documents "that pertain to or discuss the re-certification, declination of re-certification, membership, or discipline of any person to the ... Panel ... between calendar years 1993 and 2000" ("Documents Pertaining to Recertifications"), *id.* at 4 & ¶ 5; *accord id.* at 5 & ¶ 6.

The defendants object to the production of this material as not relevant and because, according to the defendants, production of these documents "would be unduly burdensome." Def. Mem. at 8; *accord* Def. Reply Mem. at 9–13. They also object to production based on the self-critical analysis and/or deliberative process privileges, as well as on the ground that the information requested by Mitchell is confidential. *See* Def. Mem. at 14–17; Def. Reply Mem. at 9–10, 12.

Each of these objections will now be discussed in turn.

### 1. *Relevance*

Mitchell contends that the information pertaining to other attorneys' recertification to the Panel should be disclosed because the information requested is "needed to determine whether or not patterns indicative of unlawful discrimination or retaliation exist." Pl. Resp. Mem. at 19; *accord id.* at 3; Pl. Mem. at 9–10. According to Mitchell, he is seeking information concerning other attorneys' recertification to the Panel so that he may compare "whether or not the same standards of performance were set for him as they were for white attorneys." Pl. Mem. at 10; *accord* Pl. Resp. Mem. at 3. Mitchell contends that discovery of the information he now seeks may reveal "that persons with lesser qualifications were re-certified" to the Panel or may allow him to uncover other patterns of racial discrimination that would be helpful to his case. Pl. Mem. at 10; *accord* Pl. Reply at 5. Mitchell also "intends to use statistics [in order] to demonstrate that African–American attorneys were more likely to be removed from the Assigned Counsel plan via the re-certification process where there was a practice among the screening panel members not to afford African–American attorneys the chance to be notified of and rebut criticisms of their work." Pl. Mem. at 9.

Fed.R.Civ.P. 26(b)(1) provides that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." "Relevance for discovery purposes is an extremely broad concept which 'has been construed ... to encompass any matter that bears on, or reasonably could lead to other matters that could bear on, any issue that is or may be in the case.'" *Tri–Star Pictures, Inc. v. Unger,* 171 F.R.D. 94, 101 (S.D.N.Y.1997) (quoting *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253

(1978)); *see also Troupin v. Metro. Life Ins. Co.,* 169 F.R.D. 546, 547 (S.D.N.Y.1996) ("[R]elevance is defined broadly to include any materials which appear reasonably calculated to lead to the discovery of admissible evidence.") (citing cases) (internal quotation marks omitted).

█ The Second Circuit has held "that an individual disparate treatment plaintiff may use statistical evidence" to support a disparate treatment claim in an employment discrimination case. *See Hollander v. Am. Cyanamid Co.,* 895 F.2d 80, 84 (2d Cir.1990) (citing cases). While evidence establishing a general pattern of discriminatory treatment by an employer "will not be determinative of the discrimination issue, it is nevertheless relevant and therefore discoverable pursuant to Fed.R.Civ.P. 26(b)(1)." *Mazzella,* 1984 WL 55541, at *8 (citing cases) (internal citation omitted). If Mitchell were to uncover information indicating that he was treated differently from other similarly-situated non-African-American applicants, such information might assist him in proving his allegations that the defendants' denial of his application for recertification was, in fact, due to an impermissible motive. *See generally Hollander,* 895 F.2d at 84–85 (district court erred by denying plaintiff's motion to compel an interrogatory answer in an employment discrimination case that sought information about the firing of other employees).

The defendants make virtually no substantive arguments countering Mitchell's contentions on the relevance of this material. They merely assert that none of the documents in their possession record the race of the applicant and conclude from this fact that the documents will necessarily fail to assist Mitchell in establishing his discrimination claim. *See* Def. Mem. at 8, 14; Def. Reply Mem. at 10, 12; Fishbein Aff. ¶ 16. But the mere fact that the documents sought by Mitchell do not record an applicant's race does not mean that information as to race is unavailable from other sources. Indeed, the pool of attorneys on the Panel is not so large that the race of these individuals might not be easily determined through Mitchell's own efforts. *See* Pl. Reply at 6–7 (stating that "[t]he community of attorneys that are mem-

bers of the ... panel is small" and describing various techniques that could be employed to discern the race of Panel applicants).

Defendants also argue that Mitchell "provides no factual information which would justify the release" of the information pertaining to other-attorney recertifications. Def. Reply Mem. at 12 (citation omitted). Defendants flesh out this mysterious statement only by noting that Mitchell is "the only African–American attorney plaintiff can identify as having applied to the Assigned Counsel Plan and who was then denied certification or re-certification" to the Panel. *Id.* (citation omitted). They then state that Mitchell has provided little information "indicat[ing] that racism" is present in the selection of Panel attorneys. *See id.* (citation omitted).

It is unclear what point defendants are trying to make. To the extent they are arguing that Mitchell must provide the Court with proof of discrimination before he is entitled to seek discovery relating to his claim of discrimination, that argument turns the purpose of discovery on its head and is rejected as frivolous. To the extent defendants are arguing there is no possibility that Mitchell could ever demonstrate discrimination simply because he is the only African–American attorney who was not recertified to the Panel, that argument too is frivolous. As should be obvious, if Mitchell uncovered evidence that similarly-situated non-African-American applicants were in fact recertified to the Panel, such evidence plainly would be relevant to his claim of discrimination.

In sum, both the names of the other attorneys and the documents pertaining to their recertification are relevant under Rule 26(b)(1).

### 2. *Deliberative Process Privilege*

█ The deliberative process privilege shields from disclosure " 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.' " *Dep't of Interior v. Klamath Water Users Protective Ass'n,* 532 U.S. 1, 8, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001)

(quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975)). Thus, "[t]he privilege protects recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir.1999) (internal quotation marks and citations omitted). The privilege applies to both intra-agency and inter-agency communications. *See, e.g., Tigue v. United States Dep't of Justice*, 312 F.3d 70, 76 (2d Cir.2002), *cert. denied*, 538 U.S. 1056, 123 S.Ct. 2214, 155 L.Ed.2d 1105 (2003). For a particular inter-agency or intra-agency document to be protected by the privilege, the agency must show that the document is both "predecisional" and "deliberative." *See, e.g., id.* at 76–77 (internal quotation marks and citations omitted).

■ A document is " 'predecisional' " when it is " 'prepared in order to assist an agency decisionmaker in arriving at his decision.' " *Hopkins v. United States Dep't of Hous. & Urban Dev.*, 929 F.2d 81, 84 (2d Cir.1991) (quoting *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975)). "[C]ourts have held that a document will be considered predecisional if the agency can '(i) pinpoint the specific agency decision to which the document correlates, (ii) establish that its author prepared the document for the purpose of assisting the agency official charged with making the agency decision, and (iii) verify that the document precedes, in temporal sequence, the decision to which it relates.' " *Nat'l Cong. for Puerto Rican Rights v. City of New York*, 194 F.R.D. 88, 92 (S.D.N.Y.2000) (quoting *Providence Journal Co. v. United States Dep't of the Army*, 981 F.2d 552, 557 (1st Cir.1992)).

■ A document is " 'deliberative' " if it is " 'actually … related to the process by which policies are formulated.' " *Hopkins*, 929 F.2d at 84 (quoting *Jordan v. United States Dep't of Justice*, 591 F.2d 753, 774 (D.C.Cir.1978) (en banc)) (alteration in original). Thus, " 'the privilege does not protect a document which is merely peripheral to actual policy formation; the record must bear on

the formulation or exercise of policy-oriented judgment.' " *Grand Cent. P'ship*, 166 F.3d at 482 (quoting *Ethyl Corp. v. EPA*, 25 F.3d 1241, 1248 (4th Cir.1994)).

### a. *List of Attorneys*

■ The deliberative process privilege does not extend to "purely factual, investigative matters." *EPA v. Mink*, 410 U.S. 73, 89, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), *superseded on other grounds by* Pub.L. No. 93–502, 88 Stat. 1561 (1974) (footnote and citations omitted); *accord Hopkins*, 929 F.2d at 85; *Local 3, Int'l Bhd. of Elec. Workers, AFL–CIO v. NLRB*, 845 F.2d 1177, 1180 (2d Cir.1988). As a result, the deliberative process privilege cannot be applied to prevent disclosure of the list of attorneys who applied for recertification to the Panel.

### b. *Documents Pertaining to Recertifications*

■ Nor can the deliberative process privilege be applied to prevent disclosure of the documents pertaining to other attorneys' recertifications. As an initial matter, some courts have held that the deliberative process privilege is not applicable "[w]here the decision-making process itself is the subject of the litigation." *See Burka v. New York City Transit Auth.*, 110 F.R.D. 660, 667 (S.D.N.Y. 1986) (citing cases); *accord Williams v. City of Boston*, 213 F.R.D. 99, 102 (D.Mass.2003); *Marisol A. v. Giuliani*, 1998 WL 132810, at *7 (S.D.N.Y. Mar.23, 1998); *Brock v. Weiser*, 1987 WL 12686, at *3 (N.D.Ill. June 15, 1987); *see also In re Subpoena Duces Tecum Served on the Office of the Comptroller of the Currency*, 145 F.3d 1422, 1424 (D.C.Cir.1998) ("[I]t seems rather obvious … that the privilege has no place in a Title VII action or in a constitutional claim for discrimination.") (footnote and citations omitted). It is not necessary to reach this issue, however, because the protections afforded by the deliberative process privilege extend only to "communications designed to directly contribute to the formulation of important public policy." *Soto v. City of Concord*, 162 F.R.D. 603, 612 (N.D.Cal.1995) (citing cases); *see also Scott v. Bd. of Educ. of City of East Orange*, 219 F.R.D. 333, 337 (D.N.J.2004) ("The Privi-

lege is properly limited to communications relating to policy formulation at the higher levels of government; it does not operate indiscriminately to shield all decision-making by public officials.") (internal quotation marks and citations omitted); *Grossman v. Schwarz*, 125 F.R.D. 376, 381 (S.D.N.Y.1989) (privilege extends "to communications relating to policy formulation at the higher levels of government") (citing *Kelly v. City of San Jose*, 114 F.R.D. 653, 658–59 (N.D.Cal.1987)). Courts have held that "[r]outine operating decisions cannot be transformed into 'policy formulation at the higher levels of government' simply because they are made at public institutions." *Torres v. City Univ. of New York*, 1992 WL 380561, at *7 (S.D.N.Y. Dec.3, 1992) (quoting *White v. New York City Health & Hosps. Corp.*, 1990 WL 33747, at *7–*8 (S.D.N.Y. Mar.19, 1990)).

While the defendants state in general terms that the information sought by Mitchell "reflect[s] the confidential deliberative function of the Screening Committee," *see* Def. Mem. at 15, defendants do not contend that the decision whether or not to recertify an attorney to the Panel "directly contribute[d] to the formulation of important public policy," *Soto*, 162 F.R.D. at 612 (citing cases). Indeed, decisions whether to certify or decertify an attorney are best characterized as "routine" decisions of the Screening Committee, *Torres*, 1992 WL 380561, at *7; *Soto*, 162 F.R.D. at 612, and thus cannot qualify for the deliberative process privilege.

### 3. *Self-Critical Analysis Privilege*

The self-critical analysis privilege "has led a checkered existence in the federal courts." *Wimer v. Sealand Serv., Inc.*, 1997 WL 375661, at *1 (S.D.N.Y. July 3, 1997). Neither the Supreme Court nor the Second Circuit has settled the question of whether the self-critical analysis privilege should be recognized as a matter of federal law. *See In re Fed'n Internationale de Basketball*, 117 F.Supp.2d 403, 407 (S.D.N.Y.2000). "Nevertheless, some courts have suggested the availability, albeit in very limited circumstances, of the so-called self-critical analysis privilege to block discovery of information pertaining to a party's evaluation of its own

performance." *Spencer v. Sea–Land Serv., Inc.*, 1999 WL 619637, at *1 (S.D.N.Y. Aug.16, 1999) (citing cases).

The privilege has been articulated in various ways. One case has described the basis for the privilege as follows: "if a party has conducted a confidential analysis of its own performance in a matter implicating a substantial public interest, with a view towards correction of errors, the disclosure of that analysis in the context of litigation may deter the party from conducting such a candid review in the future." *Wimer*, 1997 WL 375661, at *1 (citing *Chem. Bank v. Affiliated FM Ins. Co.*, 1994 WL 89292, at *1 (S.D.N.Y. Mar.16, 1994)); *accord Trezza v. Hartford, Inc.*, 1999 WL 511673, at *1 (S.D.N.Y. July 20, 1999). Another case has described the privilege in terms of a number of factors to be weighed, including "the extent to which the material in question is factual as distinguished from evaluative, the requesting party's need for the information, the extent of any harm to the disclosing party from disclosure, and any adverse effect on the accomplishment of desirable social ends." *See In re Fed'n Internationale de Basketball*, 117 F.Supp.2d at 407 (footnotes and citations omitted). Another court has held that the privilege applies "where 'an intrusion into the self-evaluative analyses of an institution would have an adverse effect on the [evaluative] process, with a net detriment to a cognizable public interest.'" *Flynn*, 1993 WL 362380, at *1 (quoting *Cobb v. Rockefeller Univ.*, 1991 WL 222125, at *1 (S.D.N.Y. Oct.24, 1991)) (citing cases) (alteration in original).

Some courts, however, have expressed skepticism concerning the availability of the self-critical analysis privilege following the Supreme Court's decision in *Univ. of Pennsylvania v. EEOC*, 493 U.S. 182, 188–95, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990), in which the Court refused to recognize a privilege for peer review materials generated by a university. *See, e.g., Troupin*, 169 F.R.D. at 549 (stating that *Univ. of Pennsylvania* "cast some doubt on the vitality of the [p]rivilege" since the Supreme Court's decision rejected a claim of privilege "based largely on the same policy considerations as the self-critical

analysis privilege") (citation omitted); *see also Roberts v. Hunt*, 187 F.R.D. 71, 75–76 (W.D.N.Y.1999) (rejecting the privilege's existence as a matter of federal law); *Franzon v. Massena Mem'l Hosp.*, 189 F.R.D. 220, 223–24 (N.D.N.Y.1999) (rejecting defendants' claim that the information being sought was "protected by a federal self-critical analysis privilege" since "there are no Supreme Court or Second Circuit cases recognizing such a privilege" and because "the viability of such a privilege is in serious doubt") (citing *Wimer*, 1997 WL 375661, at *1).

 To the extent recognized, the self-critical analysis privilege "is premised on the notion 'that disclosure of documents reflecting candid self-examination will deter or suppress socially useful investigations and evaluations or compliance with the law or with professional standards.'" *Reilly v. Metro–North Commuter R.R. Co.*, 1995 WL 105286, at *1 (S.D.N.Y. Mar.13, 1995) (quoting *Hardy v. N.Y. News, Inc.*, 114 F.R.D. 633, 640 (S.D.N.Y.1987)). "At a minimum, the party invoking the privilege must demonstrate that 'the information ... result[ed] from a critical self-analysis undertaken by the party seeking protection; [that] the public [has] a strong interest in preserving the free flow of the type of information sought; [and that] the information [is] of the type whose flow would be curtailed if the discovery were allowed.'" *Wimer*, 1997 WL 375661, at *1 (quoting Note, *The Privilege of Self–Critical Analysis*, 96 Harv. L.Rev. 1083, 1086 (1983)) (alterations in original).

 It is not necessary to dwell on the question of whether the self-critical analysis privilege exists because the defendants have failed to establish one of its critical elements: namely, that the information sought to be withheld "[is] of the type whose flow would be curtailed if the discovery were allowed." *Wimer*, 1997 WL 375661, at *1 (citation and internal quotation marks omitted). While the defendants have articulated reasons why judges and attorneys would be chilled from providing honest comments about an applicant to the Panel if their identities were divulged, defendants have not even suggested—either through affidavits or argument in their briefs—that the Committee would be chilled from conducting a review of applicants to the Panel if material relating to recertification decisions were made available to Mitchell in this litigation with a protective order limiting further disclosure. The Committee is obligated by law to determine "whether an applicant is qualified for membership on ... the panel[ ]." *See* N.Y. Comp.Codes R. & Regs. tit. 22, § 612.6. Because the Panel has this independent obligation, the facts of this case are akin to the many cases in which courts have rejected assertions of the privilege on the ground that the self-critical analysis function would occur irrespective of whether the court required that analysis to be disclosed in litigation. *See, e.g., Powell v. New York City Health & Hosps. Corp.*, 2003 WL 22871908, at *1 (S.D.N.Y. Dec.4, 2003) (rejecting the defendants' claim of privilege where the document sought to be withheld was prepared during the course of an investigation that the defendants were obligated by law to undertake). As *Cruz v. Coach Stores, Inc.*, 196 F.R.D. 228 (S.D.N.Y.2000), notes with respect to a for-profit institution, an organization "has an obvious economic interest in engaging in self-evaluations of employee misconduct.... The public interest would hardly be served by cloaking the fruits of those inquiries with privilege simply on the ground of encouraging [the organization] to make an inquiry that it necessarily would have made in any case." *Id.* at 232; *see also In re Ashanti Goldfields Sec. Litig.*, 213 F.R.D. 102, 105 (E.D.N.Y.2003) (rejecting the defendants' claim of privilege where "th[e] court [was] not convinced that disclosure of the document would impede future self-critical analysis and evaluation" given the defendants' "significant incentives to assess and correct problems in its business strategies"). That the interest here is mandated by law rather than by an "economic interest" does not change the analysis. *See Tortorici v. Goord*, 216 F.R.D. 256, 259 (S.D.N.Y.2003) (rejecting defendants' invocation of the self-critical analysis privilege in a suit brought by a former inmate's estate against prison officials because the quality assurance documents sought by the plaintiffs "were produced pursuant to a mandatory review" and, therefore,

"the essential element of a chilling effect on future investigations [was] absent").

Because defendants have not demonstrated this essential element of the self-critical analysis privilege, their assertion of this privilege must be rejected.[4]

### 4. *Rule 26 Analysis of Defendants' Confidentiality Claim*

■ An additional argument made by defendants—stated in only the most bare-bones fashion in their brief—is their appeal to the need for confidentiality. *See* Def. Mem. at 8; Def. Reply Mem. at 10. As noted, Fed. R.Civ.P. 26(b)(2) permits a Court to limit disclosure if the "burden"—including the need for confidentiality—of the proposed discovery "outweighs its likely benefit." *See Apex Oil,* 110 F.R.D. at 496; *Johnson,* 169 F.R.D. at 561–62. The problem defendants have in satisfying this standard is that they simply have not shown that any harm would result to any party if the information at issue were disclosed pursuant to a protective order.

The only affidavits defendants have submitted—from Judge Lebovits and Fishbein—focus almost exclusively upon the harm that would result if the identities of judges and attorneys were disclosed. With respect to the other-attorney certification documents, defendants state only that the documents should not be disclosed "in order to avoid embarrassment to applicants," such as those who were denied certification to or were decertified from the Panel. Fishbein Aff. ¶ 15. Significantly, the defendants do not respond to Mitchell's argument that a protective order placing limits on the disclosure of these materials could adequately address the privacy rights of non-litigants. *See, e.g.,* Pl. Mem. at 11.

Ultimately, the facts of this case are no different from other employment discrimination cases in which plaintiffs seek sensitive information from the personnel files of similarly-situated employees in order to gauge whether they have been treated differently.

For example, in *Cobb,* an employment discrimination suit, the plaintiff sought access to personnel files that the defendant claimed were "highly sensitive because they pertain[ed] to hiring and tenure decisions concerning plaintiff's former colleagues." 1991 WL 222125, at *2. The *Cobb* court, however, ordered discovery of the personnel files because "there is simply no reason to believe that plaintiff would not comply with a court order precluding her from disclosing the contents of the personnel files except for the limited purpose of this litigation." *Id.; see also Burka,* 110 F.R.D. at 668 (permitting disclosure of personnel files of employees where limits were placed on the number of individuals who had access to the information, the information was to be used solely for the purposes of the litigation, and any violator of the confidentiality order would be held in contempt).

Rule 26(c)(2) does not, of course, limit itself merely to examining the potential harm that might result from disclosure. Rather, it requires the court to balance that harm against the requester's need for the material. Here, the information contained in the other-attorney certification documents provides virtually the only means by which Mitchell can determine whether the Panel treated similarly-situated non-African-American attorneys differently. Thus, Mitchell's need for the information contained in these documents outweighs any potential harm disclosure of these documents—pursuant to a protective order—could potentially cause. *See Hardy,* 114 F.R.D. at 641–42 (concluding that "the interest of the plaintiffs in gathering the information necessary to prove their case, particularly to prove the element of discriminatory intent, outweighs the [defendants'] interest" in preventing disclosure); *Troupin,* 169 F.R.D. at 550 (ordering disclosure of factual information sought by the plaintiff because the plaintiff "has demonstrated that her specific need for the [information] outweighs the generalized harm that might result from [its] disclosure"); *see also Abbott v.*

---

4. The defendants have not addressed Mitchell's argument that they waived any claim of privilege with respect to the documents responsive to Mitchell's document request by not timely supplying a privilege log. *See, e.g.,* Pl. Mem. at 2–4. This issue need not be addressed, however, inasmuch as the Court has found that no privilege applies to any of the documents.

*Harris Publ'ns,* 1999 WL 549002, at *2 (S.D.N.Y. July 28, 1999) (rejecting the defendant's objection to disclosure on the basis of the self-critical analysis privilege because "even if the Court were inclined to recognize the privilege, the [privilege] claim would have to yield to the relevance of the documents to the issues in controversy and [plaintiff's] legitimate interest in obtaining disclosure").

### 5. *Burdensomeness Objection*

■ Finally, the defendants resist production of the other-attorney certification documents on the ground that disclosing these documents "would be unduly burdensome"—apparently using the term "burden" in the sense of economic harm. *See* Def. Mem. at 8. Unquestionably, Fed.R.Civ.P. 26(c) permits a court to "make any order which justice requires to protect a party or person from ... undue burden or expense." The moving party bears the burden of demonstrating the necessity for such an order. *See, e.g., In re Initial Pub. Offering Sec. Litig.,* 220 F.R.D. 30, 33 (S.D.N.Y.2003) (citing cases).

The defendants' argument in support of their burdensomeness objection is set forth in a single sentence in their reply memorandum of law, in which they argue merely that "the production of these documents would need to be accompanied by the polling of each attorney to determine his/her race requiring an expenditure of time and resources far out of proportion to the marginal value of the documents to this litigation." Def. Reply Mem. at 12–13. This objection is easily dealt with as the Court will not require the defendants to conduct any such "polling." None of the defendants' other submissions, including Judge Lebovits' and Fishbein's affidavits, provide any information whatsoever as to the burden of producing these materials. Accordingly, the Court must reject the defendants' claim of burdensomeness.[5]

### C. *The Terms of the Rule 26(c) Protective Order*

■ "Because of the liberality of pretrial discovery permitted by Rule 26(b)(1), it is necessary for the trial court to have the authority to issue protective orders conferred by Rule 26(c)." *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 34, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984). The Second Circuit has made clear that " '[t]he grant and nature of protection is singularly within the discretion of the district court.' " *Dove v. Atl. Capital Corp.,* 963 F.2d 15, 19 (2d Cir.1992) (quoting *Galella v. Onassis,* 487 F.2d 986, 997 (2d Cir.1973)); *see also Seattle Times,* 467 U.S. at 36, 104 S.Ct. 2199 (the trial court has "broad discretion" under Rule 26(c) because "[t]he trial court is in the best position to weigh fairly the competing needs and interests of parties affected by discovery") (footnote omitted). "Under the rules, there is a presumptive right of public access to discovery in all civil cases." *Loussier v. Universal Music Group, Inc.,* 214 F.R.D. 174, 176–77 (S.D.N.Y.2003) (citing *In re Akron Beacon,* 1995 WL 234710, at *10 (S.D.N.Y. Apr.20, 1995)). Rule 26(c), therefore, places "the burden ... on [the] movant to show good cause for barring public dissemination of discovery materials." *Condit v. Dunne,* 225 F.R.D. 113, 115 (S.D.N.Y.2004) (citing *Loussier,* 214 F.R.D. at 176–77).

As already discussed, the Court has concluded that the defendants have sufficiently demonstrated that the identities of judges and attorneys who provided comments to the Committee concerning Mitchell or any other attorney must be withheld.[6] In addition, the

---

**5.** In a cursory reference, the defendants cite to a portion of *Grossman,* 125 F.R.D. at 381–82, discussing the "governmental privilege." *See* Def. Reply Mem. at 9. While it is doubtful that the defendants' submissions can be construed as invoking this privilege, it would not shield the documents from discovery anyway because, in assessing the applicability of the governmental privilege, a court must balance the alleged harm from disclosure against the requester's need for the information being sought. *See Grossman,* 125 F.R.D. at 382 (citing cases). For the reasons

already stated, defendants have not made a sufficient demonstration of harm.

**6.** The Court notes that DEF 3, while it mentions the names of attorneys whose applications for certification to the Panel were then in the process of being reviewed by the Committee, also appears to contain the name of an attorney or judge who provided comments to the Committee concerning a Panel applicant other than Mitchell. This individual's name may be redacted in

Court recognizes the potential for embarrassment to other attorneys that might result if information concerning their performance were made publicly available. *See* Fishbein Aff. ¶ 15. Indeed, Mitchell himself concedes as much. *See, e.g.*, Pl. Mem. at 11.

Accordingly, the Court orders that the disclosure of all material relating to attorneys other than Mitchell be limited as follows: the information may be used solely for the purposes of the instant litigation to prove or defend against the claims Mitchell asserts in the Second Amended Complaint and for no other purpose.

In addition, with respect to all documents, the Court does not know whether the information being provided to Mitchell contains clues that would allow him to deduce the identity of any of the evaluators. As a result, to fully vindicate the need for confidentiality, Mitchell may not contact any evaluator whom he is able to identify from any of the documents disclosed to him with respect to any aspect of this litigation unless he obtains leave of Court following written application made on notice to the defendants.

*Conclusion*

For the reasons set forth above, the pending motions (Docket ## 81, 83) are granted in part and denied in part. The defendants need not disclose those portions of the documents identifying judges and attorneys who provided evaluations to the Committee. The remaining content of these documents must be produced.

The Court also orders that any information disclosed by the defendants concerning other attorneys' applications to the Panel may be used solely for the purposes of the instant litigation to prove or defend against the claims Mitchell asserts in the Second Amended Complaint and for no other purpose.

The Court directs that Mitchell may not contact any evaluator with respect to any aspect of this litigation, unless he obtains leave of the Court following a written application made on notice to the defendants.

None of the materials subject to this protective order shall be filed in this Court or the version of the document that is produced to Mitchell.

disclosed to any other individual unless an Order so permitting is issued by the Court.